Bijan Amini (BA 3533)
Kathleen E. Wright (KW 5439)
Bonnie A. Tucker (BT 8340)
STORCH AMINI & MUNVES, PC
Two Grand Central Tower, 25th Fl
140 East 45th Street
New York, New York 10017
Tel. (212) 490-4100
Fax (212) 490-4208
*Attorneys for Plaintiff FCC, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

| | | |
|---|---|---|
| FCC, LLC, a Florida limited liability company, | : | |
| | : | |
| Plaintiff, | : | **08 Civ. 02181 (LAP)** |
| | : | |
| v. | : | **ECF Case** |
| | : | |
| ANI INDUSTRIES, L.L.C., a New Jersey limited liability company; MIRAGE CLOTHING USA INC., a New Jersey corporation; MIRAGE CLOTHING COMPANY INC., a New York corporation; MIRAGE FASHIONS OF NY, LLC, a New York limited liability company; ANGELIQUE CLOTHING, INC., a New York Corporation; NARESH MAHTANI, individual; NAVIN MAHTANI, individual; RITESH MAHTANI, individual; and DOES 1 through 10 inclusive, | : : : : : : : : : : : | **COMPLAINT** |
| | : | |
| Defendants. | : | |

------------------------------------------------------------------------x

Plaintiff FCC, LLC ("FCC") by its attorneys Storch Amini & Munves, PC, for its

Complaint against ANI Industries, L.L.C. ("ANI"), Mirage Clothing USA Inc. ("Mirage USA"),

Mirage Clothing Company Inc. ("Mirage"), Mirage Fashions of NY, LLC ("Mirage Fashions"),

Angelique Clothing, Inc. ("Angelique"), Naresh Mahtani ("Mahtani"), Navin Mahtani ("N.

Mahtani"), Ritesh Mahtani ("R. Mahtani"), and Does 1-10 alleges as follows:

## PRELIMINARY STATEMENT

1

## PRELIMINARY STATEMENT

1.      This action is a complaint for breach of contract and breach of personal

guarantees. Pursuant to a November 2, 2005 Factoring and Security Agreement, as amended on

June 1, 2006 ("the Agreement"), between FCC and ANI, FCC agreed to make advances to ANI

to finance its operations, and those of its related entities, by purchasing invoices for goods sold

by ANI and delivered to retail outlets throughout the United States.

2.      Pursuant to the Agreement, ANI is obligated to disclose all its related entities.

Under the Agreement, all such entities assumed all of the obligations of ANI under the

Agreement and assigned to FCC any and all rights, titles and interests in their accounts.  The only

related entities ANI disclosed to FCC were defendant Angelique and non-party Little Angels.

3.      As collateral for the advances, ANI granted to FCC a security interest in all its

assets, inventory and receivables.  FCC perfected this security interest by filing the requisite

Uniform Commercial Code statement in New Jersey.  FCC also entered into an agreement with

Habib American Bank, by which Habib American Bank subordinated its prior lien on ANI's

assets to FCC's security interest.

4.      As further security for the advances, defendants Mahtani, N. Mahtani and R.

Mahtani, each executed personal guarantees by which they asked to be personally liable for all of

ANI's obligations to FCC ("the Guarantees").

5.      At all times relevant herein, FCC performed all of its obligations to ANI under the

Agreement.  However, beginning in or about July 2007, ANI, through its officers and directors,

Mahtani, N. Mahtani, R. Mahtani and others, engaged in activities in direct breach of ANI's

obligations under the Agreement.   These activities included, but are not limited to, seeking

2

advances on invoices for goods: (1) for which the customer did not wish to take delivery until long after the dates on the invoices; (2) that were delivered too late to the customers, rejected and the invoices disputed without FCC's knowledge; and (3) for goods that were never delivered.

6.    FCC has advanced more that $1,000,000 to ANI based on invalid or disputed invoices for which it has not been paid by ANI's customers and for which ANI, also in breach of the Agreement, has failed to repay the advances made by FCC.

7.    Also in breach of the Agreement, ANI failed to disclose to FCC that it was doing business through defendants Mirage, Mirage Fashions and Mirage USA and is shipping goods to ANI's customers.  Accordingly, also in breach of the Agreement, FCC has failed to assign the receivables of those entities to FCC or to pledge their assets to FCC as collateral for the advances to ANI.

8.    ANI has also breached the Agreement, by preventing FCC from taking possession of inventory held in a warehouse managed by non-party CBA Logistics, Inc. ("CBA") in Carlstadt, New Jersey, possession of which, under the Agreement, FCC has the right to take without ANI's prior consent.  The warehouse is managed by non-party Gaurav Aggarwal ("Aggarwal"), who is the Chief Financial Officer of ANI.  The registered address of CBA is the same address in New Jersey as the residence of individual defendant Mahtani.

9.    The individual defendants Mahtani, N. Mahtani and R. Mahtani, have also failed to pay ANI's outstanding debt to FCC in breach of their individual Guarantees.  FCC is not obligated to make a formal demand for payment in order to invoke the Guarantees.

10.    Due to these multiple breaches of the Agreement and the Guarantees, the corporate defendants and the individual guarantors are liable to FCC for damages in an amount to

3

be determined at trial but at least in excess of $75,000 plus the costs of bringing this suit, including reasonable attorney's fees.

## JURISDICTION AND VENUE

11.    Jurisdiction is proper pursuant to 28 U.S.C. §1332 because there exists complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12.    Personal jurisdiction over all defendants is proper because:

　　　a.    Defendant ANI is authorized to do business in the State of New York;

　　　b.    Defendants Angelique, Mirage and Mirage Fashions are New York business corporations;

　　　c.    Mirage USA, a related entity to ANI, has agreed to the jurisdiction of this judicial district;

　　　d.    Defendants N. Mahtani and R. Mahtani are residents of the state of New York; and

　　　e.     Mahtani regularly conducts business within this judicial district and contractually consented to the jurisdiction of this judicial district in his Guaranty of ANI's obligations to FCC.

13.    Venue lies in this court pursuant to 28 U.S.C. § 1391(a) in that ANI entered into the Agreement and Mahtani, N. Mahtani and R. Mahtani entered into Guarantees which agreed to the jurisdiction of the state and federal courts located in the county of New York, New York, Angelique, Mirage and Mirage Fashions reside in the district and a substantial part of the events or omissions giving rise to the claims stated herein have occurred within this judicial district.

4

## PARTIES

14.     FCC is a Florida limited liability company, authorized to do business in the States of Florida and California and at all relevant times hereto had its principal place of business in Palm Beach, Florida.

15.     Defendant ANI is a New Jersey limited liability company authorized to do business in the state of New York.  Upon information and belief, ANI's principal place of business is at 1407 Broadway, New York, New York.

16.     Defendant Angelique is a New York corporation owned by one or more of the principals of ANI, conducting business from 1407 Broadway, New York, New York.

17.     Defendant Mirage is a New York corporation which, upon information and belief, is owned by one or more of the principals of ANI and conducts its business from 1407 Broadway, New York, New York.

18.     Defendant Mirage Fashions is a New York limited liability company which, upon information and belief is owned by one of more of the principals of ANI and conducts its business from 1407 Broadway, New York, New York.

19.     Upon information and belief, Defendant Mirage USA is a New Jersey corporation owned by one or more of the principals of ANI, through which ANI conducts business and with a registered address of 6 Meadows Lane, Closter, New Jersey.

20.     Defendant Mahtani is an individual who is over the age of 18 and at all relevant times hereto resided in the State of New Jersey at 6 Meadows Lane, Closter, New Jersey.  At all relevant times herein, Mahtani was and is a principal, manager and member of ANI and its related entities including all other corporate defendants in this action.

5

21.    Upon information and belief, Defendant N. Mahtani is an individual who is over the age of 18 and at all relevant times hereto resided in the State of New York, within the county of New York. At all relevant times herein, N. Mahtani was and is a principal, manager and member of ANI and its related entities including all other corporate defendants in this action.

22.    Upon information and belief, Defendant R. Mahtani is an individual who is over the age of 18 and at all relevant times hereto resided in the State of New York, within the county of New York. At all relevant times herein, R. Mahtani was and is a principal, manager and member of ANI and its related entities, including all other defendant corporations in this action.

23.    Upon information and belief, Does 1-10 are yet to be identified entities and/or individuals through which ANI and its principals and officers conduct businesses related to ANI's business.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### The Agreement

24.    FCC is in the factoring business wherein it establishes a contractual relationship with a company from whom it purchases accounts[1] in exchange for advancing funds to the company for operating capital. A factor also receives a certain percentage of the accounts receivable as a fee for its services.

25.    The factor, in most cases including in this instance FCC, receives payment directly from its client's customers, known as "Account Debtors."[2]

---

[1] Pursuant to § 9-102(a)(2) of the Uniform Commercial Code ("UCC"), an "account" is defined as "(i) a right to payment of a monetary obligation, whether or not earned by performance, (A) for property that has been or is to be sold, leased, license, assigned, or otherwise disposed of, (B) for services rendered or to be rendered. . ."
[2] UCC §9-102(a)(3) defines an "Account Debtor" as "a person obligated on an account, chattel paper, or general intangible."

26.    On November 2, 2005, and as amended on June 1, 2006, FCC and ANI entered into the Agreement.  A true and correct copy of the Agreement is attached hereto as Exhibit A and is incorporated herein by reference.

27.    ANI is an importer of clothing from India and sells the clothing to numerous retail outlets in the United States.

28.    Pursuant to the Agreement, ANI agreed to sell to FCC "all of [ANI's] right, title and interest in and to all of [ANI's] Accounts. Factor shall be the sole and exclusive owner of such Accounts with full power to collect and otherwise deal with such accounts."  (Ex. A, § 2.1). The Agreement also required ANI to provide to FCC upon request "one copy of an invoice for each Account together with evidence of shipment, furnishing and/or delivery of the Goods or rendition of service(s)."  (Id.)

29.    In accordance with the time limitations set forth in the Agreement, FCC would make funds available to ANI in an amount equal to the portion of the purchase price for the Approved Accounts less any commissions, reserve, or other deductions in accordance with the Agreement.

30.    In the Agreement, ANI represented that at the time of each assignment to FCC, "the Account is a valid, bona fide account, representing an undisputed indebtedness incurred by the named Customer for goods actually sold and delivered or for services completely rendered." (Ex. A, § 6.1(c)).

31.    At the time of each assignment, a principal and/or officer of ANI would execute a document representing that all attached assigned invoices and bills of lading represented goods shipped and to be delivered immediately to ANI's customers.

32.    In accordance with the Agreement, FCC is permitted to chargeback to ANI all amounts advanced on invoices which ANI's customers disputed and refused to pay.

33.    In addition, in the Agreement, ANI granted to FCC as security for all present and future obligations of ANI, a continuing first priority security interest, superior in priority and dignity to all others, in all of ANI's Collateral as defined in the Agreement. (Ex. A, § 4.1)

34.    In an Intercreditor Agreement dated November 30, 2005 executed by and between FCC, Habib American Bank and ANI, Habib American Bank agreed to subordinate its security interest in ANI's Collateral to FCC.

35.    On November 7, 2005, and as amended on June 7, 2007, FCC filed UCC-1 Financing Statements with the New Jersey Secretary of State under the file number 2326712-1.

36.    Upon attachment of the security interest, FCC perfected its security interest in and to the Collateral upon the date of the filing of the UCC Financing Statement.

**ANI's Corporate Relationship with Mirage, Mirage USA, Mirage Fashions and Does 1-10**

37.    Pursuant to the Agreement, ANI was obligated to disclose all of the businesses operated by ANI through and under other trade or assumed names.  In the Agreement ANI disclosed Angelique and non-party Little Angels as the only other trade names under which it operated.

38.    Upon information and belief, Mirage, Mirage Fashions and Mirage USA are entities through which ANI conducts business in the United States and whose principals and officers are substantially the same as those of ANI.

8

39.    Upon information and belief, ANI directs and controls all of the activities of

Mirage, Mirage Fashions and Mirage USA and is shipping goods to ANI's customers through

these entities from the New Jersey warehouse managed by non-party, and ANI CFO, Aggarwal.

40.    Mirage and Mirage Fashions conduct business from the same address as ANI and

Angelique at 1407 Broadway, New York, New York.

41.    The registered address of Mirage USA is the same as the residence of individual

defendant Mahtani at 6 Meadows Lane, Closter, New Jersey.

42.    Although required to do so under the terms of the Agreement, ANI failed to

disclose to FCC the existence and names of Mirage, Mirage Fashions and Mirage USA.

43.    Pursuant to the Agreement, each entity created by the principals, officers and

directors of ANI "expressly assume[s] the obligations due to Factor by [ANI] under this

Agreement." (Ex. A § 18(c)).

44.    As such, Angelique, Mirage, Mirage Fashions and Mirage USA and Does 1-10,

yet to be identified, have assumed the obligations of ANI to FCC and all their assets are pledges

to FCC under the Agreement.

**The Personal Guarantees**

45.    In order further to induce FCC to enter into the Agreement with ANI, on

November 2, 2005, defendants Mahtani, N. Mahtani and R. Mahtani each executed a Guaranty of

Individual (collectively referred to herein as "Guarantees").

46.    The Guarantees, provided, *inter alia*, that each individual guarantor:

> unconditionally guarantees the full payment and performance by
> [ANI] of [inter alia] . . . all obligations of [ANI] under any security
> agreement, instrument of lien, security deed or other security
> device in favor of Lender, and all other obligations of Borrower to

Lender however and whenever incurred or evidenced, whether
direct or indirect, absolute or contingent, or due or to become due.

Annexed as Exhibit B are true and correct copies of the Guarantees, incorporated

herein by reference.

**Breaches of the Agreement And Guarantees**

47.     Beginning in or about July, 2007,  ANI routinely began "pre-billing" by seeking

advances from FCC for invoices for goods that were delivered long after the dates of the invoices

or not delivered at all.

48.     At a meeting on October 11, 2007 between representatives of FCC and defendants

Mahtani, N. Mahtani and R. Mahtani, ANI admitted it pre-billed invoices to its customers

Shopko, Charming and Gottschalk's.

49.     In an email to FCC dated October 15, 2007 ANI admitted that its actions

regarding pre-billed invoices were unacceptable and admitted that ANI needed monies to satisfy

its debts.

50.     ANI's customer, Shopko, informed FCC that although invoices between ANI and

Shopko were dated in July 2007 the goods were not received by Shopko until the end of August

2007.

51.     On invoices ANI provided to FCC, ANI typically pre-billed invoices to customers

by as much as forty-two (42) days.   ANI submitted invoices to FCC to obtain advances.

However, instead of delivering the goods referenced in the invoices to its customers immediately,

as required under the Agreement, ANI routinely shipped goods to a consolidator who retained

possession of the goods until the actual delivery date specified on the customers' purchase

orders.

52.    For example:

    a.    FCC received an invoice from ANI to its customer Catherines Stores in the amount of $64,428.00 with a delivery date of August 23, 2007. However, ANI submitted this invoice to FCC for factoring more than thirty (30) days before the customer had ordered the goods to be delivered.

    b.    FCC received an invoice from ANI to Catherines Stores with a delivery date if September 25, 2007 in the amount of $44,400.00.  However, ANI pre-billed this invoice by at least thirty (30) days as the goods were not delivered until October 23, 2007.

    c.    FCC received invoices from ANI to Kmart Management with delivery dates of September 10, 2007 totaling $167,047.50. However, ANI did not deliver the goods until October 2, 2007.

    d.    FCC received invoices from ANI to Kmart Management with delivery dates of August 8, 2007 totaling $70,215.00. However, the goods subject to these invoices were not delivered until September 14, 2007.

53.    Not only did ANI pre-bill for goods to be shipped much later than the dates on the invoices submitted to FCC, it also sought and received advances on invoices for goods it failed to ship to certain customers until long after the goods were due to be delivered.

54.    ANI failed to pay shippers and truckers who refused to make deliveries without payment.  Several customers rejected late delivered goods and disputed the invoices. Accordingly, FCC received no payments from those customers and ANI has not repaid the advances on those goods as required by the Agreement.

11

55.    ANI also sought and received advances from FCC for invoices for goods purportedly to be shipped to its customer Gottchalks but which were never delivered. FCC received no payment for these receivables and ANI has not repaid the advances.

56.    ANI also breached the Agreement by failing to disclose to FCC the existence and names of Mirage, Mirage Fashions and Mirage USA and possibly Does 1-10.

57.    Any entity similar to ANI, and created by Mahtani, N. Mahtani, and R. Mahtani, before or after the Agreement expressly assumed all the obligations of ANI under the Agreement.

58.    Mahtani, N. Mahtani and R. Mahtani have failed to perform their obligations pursuant to the Guarantees by, *inter alia*, failing to perform the obligations of ANI and make the payments due from ANI to FCC.

59.    Upon default under the Agreement, FCC is entitled to exercise any and all remedies available to it under the Agreement and the Guarantees without prior notice or demand.

60.    Upon default, FCC is further authorized to protect its Collateral by taking and maintaining possession of such Collateral without prior notice or demand to ANI.

## FIRST CLAIM FOR RELIEF
### Breach of Contract Against ANI

61.    Plaintiff repeats and realleges all of the foregoing paragraphs as if fully contained herein.

62.    ANI breached the Agreement by representing that all of the accounts submitted to FCC were genuine in all respects and arose out of bona fide sales of goods and represented true and correct amounts due and owing to FCC.

63.     ANI further breached the Agreement by submitting invoices to FCC that materially misrepresented the delivery date of the goods by as much as forty-two (42) days and failed to repay advances on disputed invoices or on goods that were never delivered.

64.     Pursuant to the terms of the Agreement, ANI was required to notify FCC of all businesses formed by its principals, Mahtani, N. Mahtani and R. Mahtani, which were conducting business similar to ANI's.

65.     ANI and its principals, in breach of the Agreement, failed to notify FCC of the existence and names of Mirage, Mirage Fashions, Mirage USA and possibly Does 1-10.

66.     ANI is in default under the Agreement for, *inter alia*, the reasons set forth above.

67.     FCC performed all of its obligations under the Agreement.

68.     FCC has extended credit to ANI in the amount of $1,284,795.85, which is accruing interest pursuant to the Agreement.

69.     The total of the outstanding accounts receivables due to FCC which it is likely to be able to collect from ANI's customers is no more than approximately $400,000.

70.     ANI is warehousing inventory at a warehouse in Carlstadt, New Jersey owned by non-party CBA and controlled by non-party Aggarwal, Chief Financial Officer of ANI, which has refused to release the goods to FCC despite the assignment of the goods to FCC and FCC's valid security interest in ANI's entire inventory.

71.     Upon information and belief, the value of the inventory is less than $300,000.00.

72.     As a result of the breaches of the Agreement, FCC has suffered damages in an amount to be proven at trial at least equal to the credit extended to ANI which will total, in any event, more than $75,000.00, exclusive of interest, costs and attorney's fees.

## SECOND CLAIM FOR RELIEF
### Breach of Contract Against Angelique, Mirage, Mirage Fashions, Mirage USA and Does 1-10

73.    Plaintiff repeats and realleges all of the foregoing paragraphs as if fully contained herein.

74.    FCC advanced more than $1 million to ANI under the Agreement.

75.    Pursuant to the Agreement, all entities similar to ANI and formed by ANI's principals, officers and directors "expressly assumed the obligations due [FCC] by [ANI]."

76.    Upon information and belief, the principals, officers and directors of ANI formed Angelique, Mirage, Mirage Fashions, Mirage USA and Does 1-10.

77.    Angelique, Mirage, Mirage Fashions, Mirage USA and Does 1-10 are entities through which ANI is conducting its business.

78.    As such, Angelique, Mirage, Mirage Fashions, Mirage USA and Does 1-10 have assumed all obligations of ANI to FCC under the Agreement and are liable to FCC for ANI's breaches of the Agreement.

79.    As a result of the breaches of the Agreement, FCC has suffered damages in an amount to be proven at trial at least equal to the credit extended to ANI which will total, in any event, more than $75,000.00, exclusive of interest, costs and attorney's fees.

## THIRD CLAIM FOR RELIEF
### Breach of the Guarantees Against Mahtani, N. Mahtani and R. Mahtani

80.    Plaintiff repeats and realleges all of the foregoing paragraphs as if fully contained herein.

14

81.    On November 2, 2005, defendants Mahtani, N. Mahtani and R. Mahtani each executed agreements guaranteeing all of the obligations of ANI under the Agreement including payment of all advances due and payable to FCC.

82.    Defendants Mahtani, N. Mahtani and R. Mahtani have failed to meet their obligations under the Guarantees and have not paid the advances due and owing to FCC from ANI.

83.    As a result of the breaches of the Guarantees, FCC has suffered damages in an amount to be proven at trial at least equal to the credit extended to ANI which will total, in any event, more than $75,000.00, exclusive of interest, costs and attorney's fees.

WHEREFORE, Plaintiff demands judgment be entered in its favor as follows:

1.  Awarding damages in an amount to be determined at trial, but in any event, no
    less than $75,000 plus pre and post judgment damages at the default rate set forth
    in the Agreement;

2.  Awarding the costs and expenses of this action, including reasonable attorney's
    fees as provided for in the Agreement;  and

3.  Such other and further relief as this Court deems just and proper.


Dated: New York, New York
       March 4, 2008

                              Respectfully Submitted,

                              STORCH AMINI & MUNVES, PC


                              By: _____
                                   Bijan Amini (BA 3533)
                                   Kathleen E. Wright (KW 5439)
                                   Bonnie A. Tucker (BT 8340)

                              Two Grand Central Tower, 25th Floor
                              140 East 45th Street
                              New York, New York 10017
                              (212) 490-4100
                              Attorneys for Plaintiff FCC, LLC

Exhibit A

# FACTORING AND SECURITY AGREEMENT

Date: __Nov. 2_____, 2005.

Name of Client:  ANI Industries, L.L.C. ("Client")

Client and FCC, LLC ("Factor"), hereby agree to the terms and conditions set forth in this Factoring Agreement ("Agreement"):

Section 1.  Definitions.

1.1     Defined Terms. Capitalized terms shall have the meanings ascribed to them on Schedule A.

1.2     Other Referential Provisions.

(a)     All terms in this Agreement, the Exhibits and Schedules hereto shall have the same defined meanings when used in any other Factoring Documents, unless the context shall require otherwise.

(b)     Except as otherwise expressly provided herein, all accounting terms not specifically defined or specified herein shall have the meanings generally attributed to such terms under GAAP including, without limitation, applicable statements and interpretations issued by the Financial Accounting Standards Board and bulletins, opinions, interpretations and statements issued by the American Institute of Certified Public Accountants or its committees.

(c)     All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural, and the plural shall include the singular.

(d)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provisions of this Agreement.

(e)     Titles of Articles and Sections in this Agreement are for convenience only, do not constitute part of this Agreement and neither limit nor amplify the provisions of this Agreement, and all references in this Agreement to Articles, Sections, Subsections, paragraphs, clauses, sub clauses, Schedules or Exhibits shall refer to the corresponding Article, Section, Subsection, paragraph, clause or sub clause of, or Schedule or Exhibit attached to, this Agreement, unless specific reference is made to the articles, sections or other subdivisions or divisions of, or to schedules or exhibits to, another document or instrument.

(f)     Each definition of or reference to a document in this Agreement shall include such document as amended, modified, supplemented or restated from time to time.

(g)     Except where specifically restricted, reference to a party to this Agreement includes that party and its successors and assigns.

(h)     Any and all terms used in this Agreement which are defined in the UCC shall be construed and defined in accordance with the meaning and definition ascribed to such terms under the UCC, unless otherwise defined herein.

1.3     Exhibits and Schedules. All Exhibits and Schedules attached hereto are incorporated herein by reference and made a part hereof.

Section 2.     **Purchase & Sale of Accounts.**

2.1  Purchase of Accounts.  Client hereby sells to Factor all of Client's right, title and interest in and to all of Client's Accounts.  Factor shall be the sole and exclusive owner of such Accounts with full power to collect and otherwise deal with such Accounts.  All Accounts shall be submitted to Factor on a Schedule of Accounts listing each Account separately.  The Schedule of Accounts shall be in such form as Factor may prescribe from time to time and shall be signed by an officer or authorized signer of the Client.  Client may submit such Accounts electronically, by facsimile, by mail or other delivery service of Client's choosing that is approved by Factor.  Any Accounts submitted electronically shall be submitted in such electronic format as Factor may require.  At the time the Schedule of Accounts is presented, Client shall also deliver to Factor, if requested by Factor, one copy of an invoice for each Account together with evidence of shipment, furnishing and/or delivery of the Goods or rendition of service(s).

2.2  Credit Approval.

(a)  Client shall submit to Factor the credit requirements of Client's Customers, a description of its selling terms and such other information as Factor may request.  Factor may, in its sole credit judgment, establish credit lines for sales by Client to its Customers on its normal selling terms or such other terms as Factor may approve ("Credit Lines").  Client may also submit for credit approval specific orders from Customers and Factor may, in its sole credit judgment, approve such orders on a single order approval basis ("Single Order Approval").  Accounts arising under the terms of Credit Lines or Single Order Approvals are hereinafter referred to as Approved Accounts; Accounts not arising under Credit Lines or Single Order Approvals are hereinafter referred to as Client Risk Accounts.  All Credit Approvals must be in writing to be effective.  Credit Approval(s) shall be limited to the specific terms and amounts indicated in either the Credit Line or Single Order Approval.  If Goods are shipped or services are rendered based on a verbal approval, it is Client's responsibility to ensure that such Credit Approval is received in writing.  Any Account for freight, samples, or miscellaneous sales (including, without limitation, the sale of Goods and/or in quantities not regularly sold by Client) shall always be a Client Risk Account, notwithstanding any written Credit Approval from Factor.  For purposes of determining Factor's Credit Approval hereunder, the Account(s) balance due Factor from any given Customer shall be calculated as the aggregate amount owed by that Customer less any credits to which such Customer may be entitled, and is not to be construed to mean individual invoices owed by that Customer.

(b)  Credit Approval(s) may be withdrawn, either orally or in writing, in Factor's discretion at any time before actual delivery of Goods or rendering of services.  Credit Approval(s) are automatically rescinded and withdrawn if the terms of sale vary from the terms approved by Factor, or if the terms of sale are changed by Client without Factor's prior written approval of the new terms, or if the Account is not assigned to Factor within ten days from the date of the invoice, or if the Goods are not delivered on or before the expiration of the Single Order Approval or if there is no expiration date if the Goods are not delivered within 30 days of the date of the Single Order Credit Approval.  If Accounts exceed either a Credit Line or Single Order Approval, only the amount in excess of the Credit Line or Single Order Approval shall be considered Client Risk Accounts, provided, however, that if Client ships Goods or provides services to a Customer who has outstanding Accounts owed to Client, and such Customer's Credit Line and/or outstanding Single Order Approval(s) have been withdrawn by Factor, and the Accounts created by such shipment exceed ten percent (10%) of the total amount of Client's Accounts outstanding, any Credit Approvals applying to those Accounts shall be deemed cancelled and all outstanding Accounts from that Customer are Client Risk Accounts for all purposes.

(c)  Factor shall have no liability of any kind for declining or refusing to give, or for withdrawing, revoking, or modifying, any Credit Approval pursuant to the terms of this Agreement, or for exercising or failing to exercise any rights or remedies Factor may have under this Agreement or otherwise.  In the event Factor declines to give Credit Approval on any order received by Client from a Customer and in advising Client of such decline Factor furnishes Client with information as to the credit standing of the Customer, such information shall be deemed to have been requested of Factor by Client and Factor's advice containing such information is recognized as a privileged communication.  Client agrees that such information shall not be given to Client's Customer or to Client's sales representative(s).  If necessary,

Client shall merely advise its Customer(s) that credit has been declined on the account and that any questions should be directed to Factor.

(d) Factor will assume the Credit Risk on Approved Accounts, i.e., if a Customer, after receiving and accepting the delivery of Goods or services (subject to all warranties herein) for which Factor has given written Credit Approval, fails to pay an Account when due, and such nonpayment is due solely to financial inability to pay, Factor shall bear any loss thereon up to the amount of the Credit Approval, subject to the terms and provisions stated herein or in the Credit Approval.    If Factor fails to collect an Approved Account within 120 Days of its maturity solely due to the Customer's financial inability to pay, Factor will pay the Purchase Price of such Approved Account to Client on the Collection Date.  Specifically, Factor shall not be responsible for any nonpayment of a Credit Approved Account: (i) because of the assertion of any claim or Dispute by a Customer for any reason whatsoever, including, without limitation, dispute as to price, terms of sales, delivery, quantity, quality, or other, or the exercise of any counterclaim or offset (whether or not such claim, counterclaim or offset relates to the specific Account); (ii) where nonpayment is a consequence of enemy attack, terrorism, natural disaster, civil commotion, strikes, lockouts, the act or restraint of public authorities, acts of God or force majeure; or (iii) if any representation or warranty made by Client to Factor in respect of such Account has been breached whether intentionally or unintentionally. The assertion of a Dispute by a Customer shall have the effect of negating any Credit Approval on the affected Approved Account(s) and such Approved Account(s) shall be deemed a Client Risk Account until paid or otherwise cleared from Factor's books.

(e) Client shall bear the Credit Risk on all Client Risk Accounts; Factor shall have full recourse to Client for all Client Risk Accounts. Upon demand by Factor, Client shall pay to Factor the full amount of a Client Risk Account, together with all expenses incurred by Factor up to the date of such payment, including reasonable attorney's fees in attempting to collect or enforce such payment or payment of such Account(s).

(f) If monies are owing from a Customer for both Approved Accounts and Client Risk Accounts, Client agrees that any payments or credits applying to any Account owing by such Customer will be applied:  first, to any Approved Accounts outstanding on Factor's books and second, to any Client Risk Account outstanding on Factor's books.  This order of payment applies regardless of the respective dates the sales occurred and regardless of any notations on payment items.

2.3 <u>Purchase Price</u>.

(a) On the Collection Date applicable to an Account, Factor shall pay to Client the Purchase Price for such Account, less (i) any Reserve or credit balance that Factor, in Factor's sole discretion, determines to hold, (ii) moneys remitted, paid, or otherwise advanced by Factor to or on behalf of Client (including any amounts which Client may reasonably be obligated to pay in the future), (iii) any other charges provided for by this Agreement or otherwise due Factor by Client, and (iv) any deductions taken by the Customer in connection with such Account.

(b) No discount, credit, allowance or deduction with respect to any Account shall be granted or approved by Client to any Customer without the prior written consent of Factor unless such discount, credit, allowance or deduction is shown on the face of an invoice at the time such invoice is submitted to Factor.

(c) Client shall pay to Factor or Factor may charge Client's account with Factor, the amount of any payment that Factor receives with respect to a Client Risk Account if Factor is subsequently required to return such payment, whether as a result of any proceeding in bankruptcy or otherwise.

2.4 <u>Reserve</u>. Factor shall be entitled to withhold a Reserve, and may revise the Reserve at any time and from time to time if Factor deems it necessary to do so in order to protect Factor's interests. Factor may charge against the Reserve any amount for which Client may be obligated to Factor at any time, whether under the terms of this Agreement, or otherwise, including but not limited to the repayment of any Overadvance, any damages suffered by Factor as a result of Client's breach of any provision of Section 6 hereof (whether intentional or unintentional), any adjustments due and any attorneys' fees, costs and

disbursements due. Client recognizes that the Reserve represents bookkeeping entries only and not cash funds. It is further agreed that with respect to the balance in the Reserve, Factor is authorized to withhold, without giving prior notice to Client, such payments and credits otherwise due to Client under the terms of this Agreement for reasonably anticipated claims or to adequately satisfy reasonably anticipated obligation(s) Client may owe Factor.

2.5 <u>Commission.</u>

(a)    For Factor's services hereunder, Client shall pay and Factor shall be entitled to receive a factoring commission equal to three-quarters of one percent (.75%) of the gross invoice amount of each Account, but in no event less than $5.00 per invoice or credit memo ("Commission"). The Commission shall be due and payable to Factor on the date of creation of each Account and shall be chargeable to Client's account with Factor. Factor shall be entitled to receive a surcharge equal to ___N/A___ percent (N/A%) of the gross invoice amount of all Accounts arising out of sales to any Customer that is a debtor-in-possession.

(b)    Factor's commission is based upon Client's maximum selling terms of sixty (60) days. Client will not grant additional dating to any Customer without Factor's prior written approval. If Factor approves extended terms or additional dating, the rate of Commission shall be increased by one-quarter of one percent (.25%) of the gross invoice amount of each Account for each 30 days or portion thereof of extended or additional dating.

(c)    The minimum aggregate factoring Commissions payable under this Agreement for each Contract Year shall be Sixty Thousand and No/100 Dollars ($60,000), which shall be payable at the rate of Five Thousand and No/100 Dollars ($5,000) per month. To the extent of any deficiency (after giving effect to Commissions payable under the foregoing subsections), the difference between the minimum and the amount already charged shall be chargeable to Client's account with Factor, or at Factor's option, payable by Client on Factor's demand.

2.6 <u>Notice Of Purchase.</u> All invoices submitted to Customers by Client shall plainly state on their face that the amounts payable thereunder are payable to Factor at such lockbox address as Factor may designate to Client in writing from time to time. Client agrees to execute and deliver to each Customer obligated under an Account such written notice of sale of the Account as Factor may request.

Section 3. Advances/Collections.

3.1 <u>Advances.</u>    In Factor's sole discretion, in accordance with the terms of this Agreement, Factor may from time to time advance to Client up to eighty percent (80%) of the aggregate Net Invoice Amount of Accounts outstanding at the time any such advance is made, less: (1) Any such Accounts that are in Dispute; (2) any such Accounts that are not Approved Accounts; (3) the amount of the Reserve; and (4) any interest, fees and other items, actual or estimated, that are chargeable to the Reserve. Any Advance shall be payable on demand and shall bear interest at the rate set forth in subsection 3.2 below until paid in full.

3.2 <u>Interest.</u>

(a)    Interest upon the daily net balance of all of Client's Obligations shall be payable at a rate equal to the greater of seven percent (7%) per annum or one percent (1%) above the Prime Rate (which is subject to change). Interest shall be charged to Client's account with Factor as of the last day of each month and shall constitute Obligations. Any adjustment in Factor's interest rate, whether downward or upward will become effective on the first day of the month following the month in which the Prime Rate of interest is reduced or increased.

(b) If during any month, a net credit balance exists (i.e., the Reserve or credit balance exceeds outstanding Accounts), then Factor shall credit Client's account as of the last day of each month with interest at a rate equal to three percent (3%) below the Prime Rate.

(c)  In the event that the amount of Obligations outstanding at any one time during the term of this Agreement exceeds the amount determined pursuant to subsection 3.1 (the amount of such excess Obligation is hereinafter referred to as an "Overadvance") then, in such event and until the Overadvance has been duly paid to Factor, Client shall pay to Factor a monthly Overadvance accommodation fee equal to _____N/A_____ percent ( N/A %) per month of the average outstanding balance of such Overadvance during each calendar month.

(d)  To the extent permitted by law and without limiting any other right or remedy of Factor hereunder, whenever there is a Default under this Agreement, the rate of interest on the Obligations shall, at the option of Factor, be increased to a default interest rate by adding [**five percent (5%)**] to the interest rate otherwise in effect hereunder.  Factor may charge such default interest rate retroactively beginning on the date the applicable Default first occurred or existed.  Client acknowledges that: (i) such additional rate is a material inducement to Factor to consider requests for Advances hereunder; (ii) Factor would not have made the Advances in the absence of the agreement of Client to pay such additional rate; (iii) such additional rate represents compensation for increased risk to Factor that Factor will not be repaid; and (iv) such rate is not a penalty and represents a reasonable estimate of (A) the cost to Factor in allocating its resources (both personnel and financial) to the ongoing review, monitoring, administration and collection of the Advances and Obligations, and (B) compensation to Factor for losses that are difficult to ascertain. In the event of termination of this Agreement by either party hereto, Factor's entitlement to this charge will continue until all Obligations are paid in full.

(e)  IT IS THE INTENTION OF THE PARTIES HERETO THAT AS TO ALL ACCOUNTS, THE TRANSACTIONS CONTEMPLATED HEREBY SHALL CONSTITUTE A TRUE PURCHASE AND SALE OF ACCOUNT(S) UNDER § 9-318 OF THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN THE STATE OF NEW YORK AND AS SUCH, THE CLIENT SHALL HAVE NO LEGAL OR EQUITABLE INTEREST IN SUCH PROPERTY SOLD. NEVERTHELESS, IN THE EVENT ANY PORTION OF THIS TRANSACTION IS CHARACTERIZED AS A LOAN, THE PARTIES HERETO INTEND TO CONTRACT IN STRICT COMPLIANCE WITH APPLICABLE USURY LAW FROM TIME TO TIME IN EFFECT. IN FURTHERANCE THEREOF SUCH PARTIES STIPULATE AND AGREE THAT NONE OF THE TERMS AND PROVISIONS CONTAINED IN THIS AGREEMENT SHALL EVER BE CONSTRUED TO CREATE A CONTRACT TO PAY, FOR THE USE, FORBEARANCE OR DETENTION OF MONEY, INTEREST IN EXCESS OF THE MAXIMUM RATE (AS HEREINAFTER DEFINED) FROM TIME TO TIME IN EFFECT.  NEITHER CLIENT, ANY PRESENT OR FUTURE GUARANTOR OR ANY OTHER PERSON HEREAFTER BECOMING LIABLE FOR THE PAYMENT OF THE ADVANCES, SHALL EVER BE LIABLE FOR ANY OBLIGATION THAT MAY BE CHARACTERIZED AS UNEARNED INTEREST THEREON OR SHALL EVER BE REQUIRED TO PAY ANY OBLIGATION THAT MAY BE CHARACTERIZED AS INTEREST THEREON IN EXCESS OF THE MAXIMUM AMOUNT THAT MAY BE LAWFULLY CHARGED UNDER APPLICABLE LAW FROM TIME TO TIME IN EFFECT, AND THE PROVISIONS OF THIS SECTION SHALL CONTROL OVER ALL OTHER PROVISIONS OF THIS AGREEMENT WHICH MAY BE IN CONFLICT THEREWITH. IF ANY INDEBTEDNESS OR OBLIGATION OWED BY CLIENT HEREUNDER IS DETERMINED TO BE IN EXCESS OF THE LEGAL MAXIMUM, OR FACTOR SHALL OTHERWISE COLLECT MONEYS WHICH ARE DETERMINED TO CONSTITUTE INTEREST WHICH WOULD OTHERWISE INCREASE THE INTEREST ON ALL OR ANY PART OF SUCH OBLIGATIONS TO AN AMOUNT IN EXCESS OF THAT PERMITTED TO BE CHARGED BY APPLICABLE LAW THEN IN EFFECT, THEN ALL SUCH SUMS DETERMINED TO CONSTITUTE INTEREST IN EXCESS OF SUCH LEGAL LIMIT SHALL, WITHOUT PENALTY, BE PROMPTLY APPLIED TO REDUCE THE THEN OUTSTANDING OBLIGATIONS OR, AT FACTOR'S OPTION, RETURNED TO CLIENT OR THE OTHER PAYOR THEREOF UPON SUCH DETERMINATION. IF AT ANY TIME THE RATE AT WHICH INTEREST IS PAYABLE HEREUNDER EXCEEDS THE MAXIMUM RATE, THE AMOUNT OUTSTANDING HEREUNDER SHALL CEASE BEARING INTEREST UNTIL SUCH TIME AS THE TOTAL AMOUNT OF INTEREST ACCRUED HEREUNDER EQUALS (BUT DOES NOT EXCEED) THE MAXIMUM RATE APPLICABLE HERETO.  AS USED IN THIS SECTION, THE TERM "APPLICABLE LAW" MEANS THE LAWS OF THE STATE OF NEW

YORK OR, IF DIFFERENT, THE LAWS OF THE STATE OR TERRITORY IN WHICH THE CLIENT RESIDES, WHICHEVER LAW ALLOWS THE GREATER RATE OF INTEREST, AS SUCH LAWS NOW EXIST OR MAY BE CHANGED OR AMENDED OR COME INTO EFFECT IN THE FUTURE AND THE TERM "MAXIMUM RATE" MEANS THE MAXIMUM NONUSURIOUS RATE OF INTEREST THAT FACTOR IS PERMITTED UNDER APPLICABLE LAW TO CONTRACT FOR, TAKE, CHARGE OR RECEIVE WITH RESPECT TO THE ADVANCES.

3.3 Collections.

(a) Factor shall have the right at any time with or without notice to Client, to notify any or all Customers of the assignment of the Accounts to Factor and to direct such Customers to make payment of all amounts due or to become due to Client directly to Factor. Client agrees not to change any of such instructions or to give its Customers different instructions so long as this Agreement shall remain in effect. To the extent there are no Obligations of Client owed to Factor hereunder and so long as Client is not in Default, Factor shall be deemed to have received any such proceeds of Accounts in excess of the amount of such proceeds to which Factor is entitled as owner of the Accounts as a pure pass-through for and on account of Client.

(b) Factor, as the sole and absolute owner of the Accounts, shall have the sole and exclusive power and authority to collect each such Account, through legal action or otherwise, and Factor may, in its sole discretion, settle, compromise, or assign (in whole or in part) any of such Accounts, or otherwise exercise, to the maximum extent permitted by applicable law, any other right now existing or hereafter arising with respect to any of such Accounts.

(c) Should Client receive payment of all or any portion of any Account, Client shall immediately notify Factor of the receipt of the payment, hold said payment in trust for Factor separate and apart from Client's own property and funds, and shall deliver said payment to Factor without delay in the identical form in which received. Should Client receive any check or other payment instrument with respect to any Account and fail to surrender and deliver to Factor said check or payment instrument within two (2) business days, Factor shall be entitled to charge Client a Misdirected Payment Fee to compensate Factor for the additional administrative expenses that the parties acknowledge are likely to be incurred as a result of such breach.

(d) In the event any Goods, the sale of which gave rise to an Account, are returned to or repossessed by Client, such Goods shall be held by Client in trust for Factor, separate and apart from Client's own property and subject to Factor's sole direction and control.

Section 4. Collateral.

4.1 Security Interest. In order to secure the payment of all indebtedness and Obligations of Client to Factor, Client hereby grants to Factor a first priority security interest in and lien upon all of Client's right, title and interest in and to all of Client's presently existing or hereafter arising Collateral. Client agrees to comply with all appropriate laws in order to perfect Factor's security interest in and to the Collateral and to execute such documents as Factor may require from time to time. Client authorizes Factor to file at such times and places as Factor may designate such financing statements, continuations and amendments thereto as are necessary or desirable to perfect Factor's rights in and give notice of Factor's purchase of the Accounts under the Uniform Commercial Code in effect in any applicable jurisdiction and Factor's security interest in the Collateral. Factor may at any time and from time to time file financing statements, continuation statements and amendments thereto that describe the Collateral as "all assets" of Client or words of similar effect and which contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including whether Client is an organization, the type of organization and any organization identification number issued to Client. Client agrees to furnish any such information to Factor promptly upon request. Any such financing statements, continuation statements or amendments may be signed by Factor on behalf of Client or filed by Factor without the signature of Client and may be filed at any time in any jurisdiction. Client acknowledges that it is not authorized to file any financing statement or amendment or

termination statement with respect to any financing statement naming Client as the debtor and Factor as the secured party without the prior written consent of Factor, and Client agrees that it shall not do so without the prior written consent of Factor. Client hereby ratifies any UCC financing statements previously filed by Factor.

Client shall deliver to Factor a list of all locations of its Inventory, Equipment and Goods at the effective date of this Agreement and any time such locations change. Client shall provide written notice to Factor of any change in the locations at which it keeps its Inventory, Equipment and Goods at least thirty (30) days prior to any such change. Client shall obtain from any landlord, warehouseman, or other third party operator of premises on which any Collateral is located an acceptable lien waiver or subordination agreement in Factor's favor with respect to such Collateral. In the event that any Collateral, including proceeds, is evidenced by or consists of Negotiable Collateral, Client shall, immediately endorse and assign such Negotiable Collateral over to Factor and deliver actual physical possession of the Negotiable Collateral to Factor. Client shall at any time and from time to time take such steps as Factor may request for Factor (i) to obtain an acknowledgment, in form and substance satisfactory to Factor, of any bailee having possession of any of the Collateral that such bailee holds such Collateral for Factor, (ii) to obtain "control" of any investment property, deposit accounts, letter-of-credit rights or electronic chattel paper in accordance with Article 9 of the UCC, with any agreements establishing control to be in form and substance satisfactory to Factor, and (iii) otherwise to insure the continued perfection and priority of Factor's security interest in the Collateral and of the preservation of its rights therein.

Section 5. Power of Attorney.

5.1 <u>Power of Attorney</u>. Client hereby grants to Factor an irrevocable power of attorney authorizing and permitting Factor, at its option, without notice to Client to do any or all of the following: (a) endorse the name of Client on any checks or other evidences of payment whatsoever that may come into the possession of Factor regarding Accounts or Collateral, including checks received by Factor pursuant to Section 9 hereof; (b) receive, open and dispose of any mail addressed to Client and put Factor's address on any statements mailed to Customers; (c) pay, settle, compromise, prosecute or defend any action, claim, conditional waiver and release, or proceeding relating to Accounts or Collateral; (d) upon the occurrence of a Default, notify in the name of the Client, the U.S. Post Office to change the address for delivery of mail addressed to Client to such address as Factor may designate, however, Factor shall turn over to Client all such mail not relating to Accounts or Collateral; (e) file any financing statement deemed necessary or appropriate by Factor to protect Factor's interest in and to the Accounts or Collateral, or under any provision of this Agreement; (f) effect debits to any deposit account or other account that Client or Client's principals who have executed a guaranty agreement maintain at any bank for any sums due to or from the Client under this Agreement; (g) upon a Default, to prepare and mail all invoices relating to Accounts; and (h) to take all actions necessary and proper in order to carry out this Agreement. The authority granted to Factor herein is irrevocable until this Agreement is terminated and all Obligations are fully satisfied.

Section 6. Client's Representations, Covenants and Warranties.

Section 6.1 <u>Client's Representations, Covenants and Warranties</u>. Client, as well as each of Client's principals, represent, warrant and covenant to Factor that:

(a)    Client is a corporation or limited liability company, duly organized, validly existing and in good standing under the laws of the state of New Jersey and is qualified and authorized to do business and is in good standing in all states in which such qualification and good standing are necessary or desirable;

(b)    The execution, delivery and performance by Client of this Agreement does not and will not constitute a violation of any applicable law, violation of Client's articles of incorporation or organization or bylaws or any material breach of any other document, agreement or instrument to which Client is a party or by which Client is bound. The Agreement is a legal, valid and binding obligation of Client enforceable against it in accordance with its terms;

(c )    Client is the sole owner and holder of all Accounts and there is no security interest, lien, judgment or other encumbrance in or affecting such Accounts or any of the other Collateral except as set

forth on Schedule 6.1 c hereof.  At the time of assignment to Factor, the Account is a valid, bona fide account, representing an undisputed indebtedness incurred by the named Customer for goods actually sold and delivered or for services completely rendered;

        (d)      Other than those discounts, allowances and deductions set forth on the face of the invoice at the time it was assigned to Factor, there are and shall be no set-offs, allowances, discounts, deductions, counterclaims, or disputes with respect to any Account.  Client shall inform Factor, in writing, immediately upon learning that there exists any Dispute.  Client shall accept no returns and shall grant no allowance or credit to any Customer without prior written notice to Factor.  If required by Factor, Client shall submit to Factor credit memos itemized on a separate Schedule of Accounts for all returns and allowances made during the previous week.  At Factor's option, Factor may require that Client pay Factor for the amount of such credit memos, or in Factor's sole and exclusive discretion, Factor may agree to accept the Schedule of Accounts and apply same to Client's Reserve;

        (e)      Client's address, as set forth below its signature line hereto, is Client's mailing address, its chief executive office, principal place of business and the office where all of the books and records concerning the Accounts and/or Collateral are maintained which shall not be changed without giving thirty (30) days prior written notice to Factor;

        (f)      Client shall maintain its books and records in accordance with GAAP and shall reflect on its books the absolute sale of the Accounts to Factor.  Client shall furnish Factor, upon request, such information and statements, as Factor shall require from time to time regarding Client's business affairs, financial condition and results of its operations.  Without limiting the generality of the foregoing, Client shall provide Factor, (i) on or prior to the 30th day of each month, unaudited financial statements with respect to the prior month, (ii) within ninety (90) days after the end of each of Client's fiscal quarters, reviewed financial statements (on a fiscal year-to-date basis) prepared by a CPA acceptable to Factor, (iii) a certificate from the president or chief financial officer of Client stating whether any Default has occurred and stating the nature of the Default, and (iv) such other information as Factor may request.  Client will furnish to Factor upon request a current listing of all open and unpaid accounts payable.  All financial statements and reports furnished to Factor hereunder shall be prepared and all financial computations and determinations pursuant hereto shall be made in accordance with GAAP;

        (g)      Client has paid and will pay all taxes and governmental charges imposed with respect to sale of Goods and rendition of services and shall furnish to Factor upon request satisfactory proof of payment and compliance with all federal, state and local tax requirements;

        (h)      Client will promptly notify Factor of (i) the filing of any lawsuit against Client involving amounts greater than $10,000.00, and (ii) any attachment or any other legal process levied against Client;

        (i)      The application made and information delivered by or on behalf of Client in connection with this Agreement, and the statements made therein are true and correct at the time that this Agreement is executed.  There is no fact which Client has not disclosed to Factor in writing which could materially adversely affect the properties, business or financial condition of Client, or any of the Accounts or Collateral, or which is necessary to disclose in order to keep the foregoing representations and warranties from being misleading;

        (j)      In no event shall the funds paid to Client hereunder be used directly or indirectly for personal, family, household or agricultural purposes;

        (k)      Client does business under no trade or assumed names except as indicated below.  These names are a trade name and/or tradestyle by which Client will or may identify and sell certain of its products and under which Client will or may conduct a portion of its business, and are not an independent corporation or other legal entity.  Factor is hereby authorized to receive, endorse and deposit any and all checks sent to it in payment of such Accounts including such checks as are payable to any of the trade styles or tradenames.  Accounts invoiced in the name of any tradename or tradestyle are subject to all of the terms and conditions of this Agreement with the same force and effect as if they were in our corporate name.

Tradestyles:    Angelique
                          Little Angels

(l)      Any invoice or written communication that is issued by Client to Factor by facsimile transmission is a duplicate of the original;

(m)     Any electronic communication of data, whether by e-mail, tape, disk, or otherwise that Client remits or causes to be remitted to Factor shall be authentic and genuine; and

(n)      Client does not own, control or exercise dominion over, in any way whatsoever, the business of any Account or Customer.

(o)      Client will not merge or consolidate with any other Person or sell, transfer, lease, abandon, or otherwise dispose of a substantial portion of Client's assets or any of the Collateral or any interest therein, except that, so long as no Default has occurred and is continuing, Client may sell Inventory in the ordinary course of Client's business.

(p)      Client will not obtain or attempt to obtain from any Person other than Factor any loans, advances, or other financial accommodations or indebtedness of any kind, nor will Factor enter into any direct or indirect guaranty of any obligation of another Person. Client will not permit any of Client's assets or any part of the Collateral to be subject to any Lien.

(q)      **No Distributions.** Client will not retire, repurchase or redeem any of Client's capital stock or other ownership interest in Client, nor declare or pay any dividend in cash or other property (other than additional shares of capital stock or additional ownership interests) to any owner or holder of Client's shares or other ownership interest; provided, however, that so long as no Default exists and Client is effectively treated as a limited liability company under the Internal Revenue Code, Client may make distributions or pay dividends to its members in an amount not to exceed the federal and state income tax liability of such members which is directly attributable to Client's operations and financial results (which amount shall not, in any event, exceed forty percent (40%) of Client's net income, determined in accordance with GAAP, for the period for which such taxes are calculated).

(r)      **Loans/Investments.** Client will not make any loans or advances to or extend any credit to any Person except (i) the extension of trade credit in the ordinary course of business; and (ii) advances to employees not to exceed an aggregate outstanding amount of $10,000 at any one time outstanding for all employees. Client shall not purchase, acquire or otherwise invest in any Person except: (A) existing investments in Client's subsidiaries; (B) direct obligations of the United States of America maturing within one year from the acquisition thereof; (C) certificates of deposit issued by, or investment accounts in, banks or financial institutions having a net worth of not less than $50,000,000; and (D) commercial paper rated A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc. Without limiting the generality of the foregoing, Client shall not create any new subsidiary.

Section 7. Administration.

7.1    Disputes/Chargebacks.    Client shall notify Factor immediately upon the assertion by a Customer of a Dispute and Factor may charge such Account back to Client. Factor may charge back to Client all amounts owing on Client Risk Accounts at any time either before or after the due date. Client indemnifies and holds Factor harmless from and against any and all loss, costs and expenses arising out of Disputes or Client Risk Accounts, including collection and attorneys fees with respect thereto. A chargeback shall not be deemed a reassignment of an Account and title thereto and to the Goods represented thereby shall remain in Factor until such time as Factor executes a reassignment of the Account.

7.2    Expenses.   Client shall pay all costs incurred by Factor pursuant to this Agreement, including without limitation, search and filing fees, wire and ACH transfer fees, audit and field examination fees,

legal fees (including the allocated cost of internal counsel) for preparation of this Agreement and any other Factoring Documents and the perfection, preservation and enforcement of any of Factor's rights hereunder.

      7.3 <u>Credit Inquiries</u>.  Client authorizes Factor to disclose such information as Factor deems appropriate to persons making credit inquiries about Client.

      Section 8. Accounting Information.

      8.1 <u>Accounting Statements</u>.  Factor shall provide Client with information on the Accounts and a monthly reconciliation of the factoring relationship relating to billing, collection, Advances and account maintenance such as aging, posting, error resolution and e-mailing or mailing of statements. All of the foregoing shall be in a format and in such detail, as Factor, in its sole discretion, deems appropriate. Factor's books and records shall be admissible in evidence without objection as prima facie evidence of the status of the Accounts and Reserve between Factor and Client. Each statement, report, or accounting rendered or issued by Factor to Client shall be deemed conclusively accurate and binding on Client unless within thirty (30) days after the date of issuance Client notifies Factor to the contrary pursuant to Section 11 hereof, setting forth with specificity the reasons why Client believes such statement, report, or accounting is inaccurate, as well as what Client believes to be correct amount(s) therefore. If the Client gives notice of its disagreement with Factor's statement, all matters in such statement that are not objected to in Client's notice, shall be deemed conclusively accurate and binding on Client. Client's failure to receive any monthly statement shall not relieve it of the responsibility to request such statement and Client's failure to do so shall nonetheless bind Client to whatever Factor's records would have reported.

      8.2 <u>Inspections.</u>  Factor shall have the right at any time, at Client's expense, to visit and inspect Client's books and records, and to make and take away copies of Client's books and records.

      Section 9. Defaults and Remedies.

      9.1 <u>Default</u>.  A Default shall be deemed to have occurred hereunder upon the happening of one or more of the following: (a) Client shall fail to pay as and when due any amount owed to Factor; (b) any Obligor shall breach any covenant, warranty or representation set forth herein or in any Factoring Document or same shall be untrue when made; (c) any Obligor becomes insolvent in that its debts are greater than the fair value of its assets or is unable to pay its debts as they mature, or admits in writing that it is insolvent or unable to pay its debts, makes an assignment for the benefit of creditors, makes a conveyance fraudulent as to creditors under any state or federal law, or a proceeding is instituted by or against any Obligor alleging that such Obligor is insolvent or unable to pay debts as they mature, or a petition under any provision of Title 11 of the United States Code, as amended, or any state insolvency proceeding is filed by or against any Obligor; (d) any involuntary lien, garnishment, attachment or the like shall be issued against or shall attach to the Accounts, the Collateral or any portion thereof and the same is not released within ten (10) days; (e) any Obligor suffers the entry against it for a final judgment for the payment of money in excess of $10,000.00, unless the same is discharged within thirty (30) days after the date of entry thereof or an appeal or appropriate proceeding for review thereof is taken within such periods and a stay of execution pending such appeal is obtained; (f) any report, certificate, schedule, financial statement, profit and loss statement or other statement furnished by Client, or by any Obligor or other person on behalf of Client, to Factor is not true and correct in any material respect; (g) Client shall have a federal or state tax lien filed against any of its properties, or shall fail to pay any federal or state tax when due, or shall fail to file any federal or state tax form as and when due; (h) a material adverse change shall have occurred in Client's financial conditions, business or operations; (i) any suspension of the operation of Client's present business; (j) death of any Obligor who was a natural person, or death or withdrawal of any partner of any Obligor that is a partnership, or dissolution, merger, or consolidation of any Obligor that is a corporation, partnership or limited liability company; (k) transfer of a substantial part (determined by market value) of the property of any Obligor; (l) sale, transfer or exchange, either directly or indirectly, of a controlling stock or equity ownership interest of any Obligor; (m) termination, unenforceability or withdrawal of any guaranty for the Obligations, or failure of any Obligor to perform any of its obligations under such a guaranty or assertion by any Obligor that it has no liability or obligation under such a guaranty, or (n) Factor shall deem itself insecure with respect to its interest in the Collateral or prospects for repayment.

9.2 <u>Remedies</u>. (a) Upon a Default, Factor may, without demand or notice to Client, exercise all rights and remedies available to it under this Agreement, under the UCC or otherwise, including without limitation, terminating this Agreement and declaring all Obligations immediately due and payable provided, however, in the event of a Default described under clause (C) of Section 9.1, such termination and acceleration shall automatically occur without any notice, demand or presentment of any kind.

(b)      Without notice to or demand upon Client or any other Person, Factor may make such payments and do such acts as Factor considers necessary or reasonable to protect its security interest in the Collateral. Client authorizes Factor to enter each premises where any Collateral is located, take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any lien which in Factor's opinion appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. Factor may ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral. Any such sale may be either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms. It is not necessary that the Collateral be present at any such sale.

(c )      Factor shall be entitled to any form of equitable relief that may be appropriate without having to establish that any remedy at law is inadequate or other grounds. Factor shall be entitled to freeze, debit and/or effect a set-off against any fund or account Client may maintain with any bank. In the event Factor deems it necessary to seek equitable relief, including, but not limited to, injunctive or receivership remedies, as a result of a Default, Client waives any requirement that Factor post or otherwise obtain or procure any bond. Alternatively, in the event Factor, in its sole and exclusive discretion, desires to procure and post a bond, Factor may procure and file with the court a bond in an amount up to and not greater than $10,000.00 notwithstanding any common or statutory law requirement to the contrary. Upon Factor's posting of such bond it shall be entitled to all benefits as if such bond was posted in compliance with state law. Client waives any right it may be entitled to, including an award of attorney's fees or costs, in the event any equitable relief sought by and awarded to Factor is thereafter, for whatever reason(s), vacated, dissolved or reversed.

9.3 <u>Cumulative Rights; Waivers</u>. The occurrence of any Default shall entitle Factor to all of the default rights and remedies (without limiting the other rights and remedies exercisable by Factor either prior or subsequent to a Default) as available to a Secured Party under the Uniform Commercial Code in effect in any applicable jurisdiction. All rights, remedies and powers granted to Factor in this Agreement, or in any other instrument or agreement given by Client to Factor or otherwise available to Factor in equity or at law, are cumulative and may be exercised singularly or concurrently with such other rights as Factor may have. These rights may be exercised from time to time as to all or any part of the Accounts hereunder or the Collateral as Factor in its discretion may determine. In the event that any part of this transaction between Client and Factor is construed to be a loan from Factor to Client, any advances or payments made as the Purchase Price for all Accounts shall be secured by the Accounts and the Collateral. Factor may not be held to have waived its rights and remedies unless the waiver is in writing and signed by Factor. A waiver by Factor of a right, remedy or default under this Agreement on one occasion is not a waiver of any right, remedy or default on any subsequent occasion. No exercise by Factor of one right or remedy shall be deemed an election, and no waiver by Factor of any default on Borrower's part shall be deemed a continuing waiver. No delay by Factor shall constitute a waiver, election or acquiescence by it.

Section 10. Term.

10.1 <u>Term</u>. The Original Term of this Agreement shall end November 1, 2007 (the "Original Term") provided that this Agreement shall be extended automatically for additional one (1) year terms unless written notice of termination is given by Client to Factor at least sixty (60) days, but not more than ninety (90) days, prior to the end of the Original Term or any extension thereof. Prior to any termination of this Agreement becoming effective, Client shall pay any minimum annual Commission that remains unpaid for the Contract Year in which this Agreement is terminated. Notwithstanding anything herein to the contrary, Factor may terminate this Agreement i) at any time after the occurrence of a Default, or ii) assuming no Default by Client, Factor may terminate this Agreement at any time by giving not less than thirty (30) days notice provided, however, that if Factor terminates this Agreement prior to the end of the

Original Term other than upon the occurrence of a Default, Client shall not be obligated to pay any Termination Fee. Notwithstanding payment in full of all Obligations by Client, any such notice of termination is conditioned on Client's delivery, to Factor, of a general release in a form reasonably satisfactory to Factor. Client understands that this provision constitutes a waiver of its rights under § 9-513 of the UCC. Factor shall not be required to record any terminations or satisfactions of any of Factor's liens on the Collateral unless and until Client has executed and delivered to Factor said general release and Client shall have no authority to do so without Factor's express written consent. Any termination of this Agreement shall not affect Factor's security interest in the Collateral and Factor's ownership of the Accounts, and this Agreement shall continue to be effective, until all transactions entered into and Obligations incurred hereunder have been completed and satisfied in full. The indemnification provisions of this Agreement shall survive the termination of this Agreement. All Obligations shall be immediately due and payable in full upon termination of this Agreement.

Section 11. Notices. Any notice or communication with respect to this Agreement shall be given in writing, sent by (i) personal delivery, or (ii) overnight delivery service with proof of delivery, or (iii) United States mail, first-class with postage prepaid, or registered or certified mail, or (iv) prepaid telegram, telex or telecopy, addressed to each party hereto at its address and to the attention of the person listed as set forth below the signatures of the parties to this Agreement. Any such notice or communication shall be deemed to have been given either at the time of personal delivery or, in the case of overnight delivery service or telecopy, on the next business day at the receiving location or in the case of mail, upon receipt.

Section 12. Attorney's Fees. Client agrees to reimburse Factor upon demand for all reasonable attorney's fees, court costs and other expenses incurred by Factor in the preparation, negotiation and enforcement of this Agreement and protecting or enforcing its interest in the Accounts or the Collateral, or in the representation of Factor in connection with any bankruptcy case or insolvency proceeding involving Client, the Collateral, or any Accounts, including any defense of any Avoidance Claims (except to the extent related to Approved Accounts where no Dispute exists). Client hereby agrees to pay such fees, costs and expenses and Factor shall also have the right to charge the Reserve therefore. Notwithstanding the existence of any law, statute or rule, in any jurisdiction which may provide Client with a right to attorney's fees or costs, Client hereby waives any and all rights to hereafter seek attorney's fees or costs hereunder and Client agrees that Factor exclusively shall be entitled to indemnification and recovery of any and all attorney's fees or costs in respect to any litigation based hereon, arising out of, or related hereto, whether under, or in connection with, this and/or any agreement executed in conjunction herewith, or any course of conduct, course of dealing, statements (whether verbal or written) or actions of either party.

Section 13. Indemnity. Client hereby indemnifies and agrees to hold harmless and defend Factor from and against any and all claims, judgments, liabilities, fees and expenses (including attorney's fees) which may be imposed upon, threatened or asserted against Factor at any time and from time to time in any way connected with this Agreement or the Collateral. The foregoing indemnification shall apply whether or not such indemnified claims are in any way or to any extent owed, in whole or in part, under any claim or theory of strict liability, or are caused, in whole or in part, by any negligent act or omission of Factor.

Section 14. Severability. Each and every provision, condition, covenant and representation contained in this Agreement is, and shall be construed to be, a separate and independent covenant and agreement. If any term or provision of this Agreement shall to any extent be invalid or unenforceable, the remainder of the Agreement shall not be affected thereby.

Section 15. Parties in Interest. All grants, covenants and agreements contained in this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Client may not delegate or assign any of its duties or obligations under this Agreement without the prior written consent of Factor. Notwithstanding anything herein to the contrary, the Factor may, without consent of the Client, grant a security interest in, sell or assign, grant or sell participations in or otherwise transfer all or any portion of its rights and obligations hereunder to one or more Persons.

Section 16. <u>Governing Law; Submission to Process and Venue</u>. This Agreement shall be deemed a contract made under the laws of the State of New York and shall be construed and enforced in accordance with and governed by the internal laws of the State of New York, without reference to the rules thereof relating to conflicts of law. Client hereby irrevocably submits itself to the exclusive jurisdiction of the state and federal courts located in the county of New York, New York, and agrees and consents that service of process may be made upon it in any legal proceeding relating to this Agreement, the purchase of Accounts or any other relationship between Factor and Client by any means allowed under state or federal law. Client hereby waives and agrees not to assert, by way of motion, as a defense or otherwise, that any such proceeding, is brought in any inconvenient forum or that the venue thereof is improper.

Section 17. <u>Complete Agreement</u>. This Agreement, the written documents executed pursuant to this Agreement, if any, and the acknowledgment delivered in connection herewith set forth the entire understanding and agreement of the parties hereto with respect to the transactions contemplated herein and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. No modification or amendment of or supplement to this Agreement shall be valid or effective unless the same is in writing and signed by the party against whom it is sought to be enforced.

Section 18. <u>Miscellaneous.</u>

(a)     Client acknowledges that there is no, and it will not seek or attempt to establish any, fiduciary relationship between Factor and Client, and Client waives any right to assert, now or in the future, the existence or creation of any fiduciary relationship between Factor and Client in any action or proceeding (whether by way of claim, counterclaim, crossclaim or otherwise) for damages.

(b)     This Agreement shall be deemed to be one of financial accommodation and not assumable by any debtor, trustee or debtor-in-possession in any bankruptcy proceeding without Factor's express written consent and may be suspended in the event a petition in bankruptcy is filed by or against Client.

(c)     In the event Client's principals, officers or directors form a new entity, whether corporate, partnership, limited liability company or otherwise, similar to that of Client during the term of this Agreement, such entity shall be deemed to have expressly assumed the obligations due Factor by Client under this Agreement. Upon the formation of any such entity, Factor shall be deemed to have been granted an irrevocable power of attorney with authority to file, on behalf of the newly formed successor business, a new UCC-1 or UCC-3 financing statement with the appropriate secretary of state or UCC filing office. Factor shall be held-harmless and be relieved of any liability resulting from the filing of a financing statement or the resulting perfection of a lien in any of the successor entity's assets. In addition, Factor shall have the right to notify the successor entity's Customers of Factor's lien rights, its right to collect all Accounts, and to notify any new factor or lender who has sought to procure a competing lien of Factor's right is in such successor entity's assets.

(d)     Client expressly authorizes Factor to access the systems of and/or communicate with any shipping or trucking company in order to obtain or verify tracking, shipment or delivery status of any Goods regarding an Account.

(e)     Client's principal(s) acknowledge that the duty to accurately complete each Schedule of Accounts is critical to this Agreement and as such all obligations with respect thereto are non-delegable. Each of Client's principal(s) acknowledge that he/she shall remain fully responsible for the accuracy of each Schedule of Accounts delivered to Factor regardless of who is delegated the responsibility to prepare and/or complete such Schedule of Accounts.

(f)     Client shall indemnify Factor from any loss arising out of the assertion of any Avoidance Claim. Client shall notify Factor within two business days of it becoming aware of the assertion of an Avoidance Claim.

(g)    Client agrees to execute any and all forms (i.e. Forms 8821 and/or 2848) that Factor may require in order to enable Factor to obtain and receive tax information issued by the Department of the Treasury, Internal Revenue Service, or receive refund checks.

(h)    The Client shall make each payment required hereunder, and/or under any instrument delivered hereunder, without setoff, deduction or counterclaim.

Section 19.  Waiver of Jury Trial, Punitive and Consequential Damages, Etc.  CLIENT AND FACTOR HEREBY (A) IRREVOCABLY WAIVE ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY AT ANY TIME ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED HEREBY OR ASSOCIATED HEREWITH; (B)  CLIENT IRREVOCABLY WAIVES, TO THE MAXIMUM EXTENT NOT PROHIBITED BY LAW, ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY SUCH LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES, OR DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES AND CLIENT HEREBY RELEASES AND EXCULPATES FACTOR, ITS OFFICERS, EMPLOYEES AND DESIGNEES, FROM ANY LIABILITY ARISING FROM ANY ACTS UNDER THIS AGREEMENT OR IN FURTHERANCE THEREOF WHETHER OF OMISSION OR COMMISSION, AND WHETHER BASED UPON ANY ERROR OF JUDGMENT OR MISTAKE OF LAW OR FACT, EXCEPT FOR WILLFUL MISCONDUCT; (C) AND CLIENT CERTIFIES THAT NO PARTY HERETO NOR ANY REPRESENTATIVE OR AGENT OR COUNSEL FOR ANY PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, OR IMPLIED THAT SUCH PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS; AND (D) CLIENT ACKNOWLEDGES THAT FACTOR HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY, IN PART, AS A RESULT OF THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED IN THIS SECTION.

In Witness Whereof, the parties have set their hands and seals on the day and year first hereinabove written.

FCC, LLC

By: _____
   Ric Mazza, Executive Vice President


1177 Avenue of the Americas, 33rd Floor
New York, New York  10036
Attention: Ric Mazza


ANI INDUSTRIES, L.L.C.

By: _____
   Naresh Mahtani, Member/Manager


1407 Broadway, Suite 931
New York, New York  10018
Attention: Naresh Mahtani

STATE OF _New York_
COUNTY OF _New York_

     I HEREBY CERTIFY that on this day personally appeared before me, an officer duly authorized to administer oaths and take acknowledgements, Naresh Mahtani, as Member/Manager of ANI Industries, L.L.C., a New Jersey limited liability company ( ) who has produced the following identification: _____ or ( ) who is personally known to me, and who acknowledged before me that he executed the same for the purposes therein expressed, as the act and deed of said limited liability company.

     WITNESS my hand and official seal in the County and State last aforesaid on this _____ day of _November_, 2005.

                                     Notary Public, State of _New York_
                                       My Commission Expires:

                                  ARTHUR STRACHMAN
                   NOTARY PUBLIC, State of New York
                       No. 01ST6118985
                     Qualified in Nassau County
                 Commission Expires Nov. 22, 2008

# SCHEDULE "A"

## Definitions

"Account(s)" means (i) all "accounts" as defined in the UCC, whether presently existing or hereafter arising due to Client, and (ii) all presently existing or hereafter arising accounts receivable due to Client (including medical and health-care-insurance receivables), book debts, notes, drafts and acceptances and other forms of obligations or rights to payment of a monetary obligation now or hereafter owing to Client, whether arising from the sale or lease of goods or the rendition of services by Client (including any obligation that might be characterized as an account, contract right, general intangible or chattel paper under the UCC), all of Client's rights in, to and under all purchase orders now or hereafter received by Client for goods and services, all proceeds from the sale of Inventory, all monies due or to become due to Client under all contracts for the sale or lease of goods or the rendition of services by Client (whether or not yet earned by performance) (including the right to receive the proceeds of said purchase orders and contracts), all collateral security and guarantees of any kind given by any obligor with respect to any of the foregoing, and all goods returned to or reclaimed by Client that correspond to any of the foregoing and all proceeds of the foregoing..

"Advance" means amounts advanced by Factor to or for the benefit of the Client under this Agreement or otherwise, including amounts charged to Client's account with Factor, which are used to pay interest, expenses, fees, commissions, to reimburse Factor for amounts paid by it on behalf of Client or to protect Factor's rights and interests hereunder including, without limitation, ownership of the Accounts and its security interest in Collateral, and any other items payable by Client to Factor under this Agreement or the Factoring Documents.

"Agreement" means this Agreement, including the Exhibits and any Schedules hereto, and all amendments, modifications and supplements hereto and thereto and restatements hereof and thereof.

"Approved Account" means an Account representing a sale to a Customer within the terms of a Credit Line established for such Customer on Client's normal selling terms or within the Single Order Approval issued by Factor provided that delivery is completed while such Credit Line or Single Order Approval remains in effect and such Account has not been charged back to the Client.

"Avoidance Claim" means any claim that any payment received by Factor from or for the account of an Account Debtor is avoidable under the federal Bankruptcy Code or any other debtor relief statute.

"Chattel Paper" means (i) all "chattel paper" as defined in the UCC, and (ii) all record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods.

"Client Risk Account" means those Accounts for which Factor has not given Credit Approval, for which Credit Approval has been withdrawn or revoked or with respect to which Factor is not responsible under Section 2 hereof.

"Collateral" means and includes all of Client's right, title and interest in and to all of Client's property, whether real or personal, tangible or intangible, now owned or existing or hereafter acquired or arising and wherever located, including all of the following: (a) Accounts, (b) Chattel Paper, (c) Commercial Tort Claims, (d) Deposit Accounts, (e) Documents, (f) Equipment (g) General Intangibles (including but not limited to all files, correspondence, computer programs, tapes, disks and related data processing software which contain information identifying or pertaining to any of the Collateral or any Customer or showing the amounts

thereof or payments thereon or otherwise necessary or helpful in the realization thereon or the collection thereof), (h) Goods, (i) Inventory, (j) Instruments, (k) Investment Property, (l) Letters of Credit and Letter of Credit Rights, (m) Negotiable Collateral (n) the Reserve, (o) all Supporting Obligations, (p) all other personal property assets of the Client and (q) all proceeds and products of the foregoing.

"Collection Date" means (a) for payments received by Factor in payment of Accounts, the date a check, draft or other item representing payment on an invoice is posted to Factor's account plus five (5) business days; or (b) for Approved Accounts paid by Factor solely due to the Customer's financial inability to pay, the Friday of the calendar week following the calendar week in which the 120 day period for such Approved Account ends.

"Commercial Tort Claim" means (i) all "commercial tort claims" as defined in the UCC, and (ii) all claims arising in tort with respect to which:  (A) The claimant is an organization; or (B) The claimant is an individual and the claim: (x) arose in the course of the claimant's business or profession; and (y) does not include damages arising out of personal injury to or the death of an individual.

"Contract Year" means the twelve month period ending on the date that is twelve months after the effective date of this Agreement and the twelve month period ending on each annual anniversary thereof.

"Credit Approval(s) and Credit Approved" means, with regard to an Approved Account, that Factor has accepted the Credit Risk.

"Credit Risk" means the Customer's failure to pay an Account when due solely because of its financial inability to pay.

"Customer" means any Person who is obligated on an Account, Chattel Paper or General Intangible.

"Default" means any of the events specified in Section 9 of this Agreement that, with the passage of time or giving of notice or both, would constitute a Default.

"Deposit Account" means (i) all "deposit accounts" as defined in the UCC , and (ii) any demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union, trust company or like organization, other than an account evidenced by a certificate of deposit that is an instrument under the UCC.

"Dispute or Disputed Account" means any claim, whether or not provable, bona fide, or with or without support, made by an Customer as a basis for refusing to pay an Account, either in whole or in part, including, but not limited to, any contract dispute, charge back, credit, right to return Goods, or other matter which diminishes or may diminish the dollar amount or timely collection of such Account.

"Documents" means a document of title or a receipt of the type described in UCC 7-201(2).

"Equipment" means (a) all "equipment" as defined in the UCC, and (b) all of Client's present and hereafter acquired machinery, equipment, furniture, fixtures, goods, and all other tangible personal property (other than Inventory), including computer and other electronic data processing equipment and other office equipment and supplies, computer programs and related data processing software, embedded software, spare parts, tools, motors, automobiles, trucks, tractors and other motor vehicles, rolling stock, jigs, as well as all of such types of property leased by Client and all of Client's rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all present and future additions and accessions thereto, replacements therefor, component and auxiliary parts and supplies used or to be used in connection therewith, and all substitutes for any of the foregoing, and all manuals, drawings, instructions, warranties and rights with respect thereto; wherever any of the foregoing is located.

"Factoring Documents" means, collectively, this Agreement and any other agreements, instruments, certificates or other documents entered into in connection with this Agreement, including collateral documents, letter of credit agreements, riders covering inventory or other loans, security agreements, pledges, guaranties, mortgages, deeds of trust, assignments and subordination agreements, and

any other agreement executed by Client, any guarantor or any affiliate of Client or any guarantor pursuant hereto or in connection herewith.

"<u>Financing Statement</u>" means each Uniform Commercial Code financing statement naming the Factor as purchaser/secured party and the Client as Client/debtor, in connection with this Agreement.

"<u>GAAP</u>" means generally accepted accounting principles consistently applied and maintained throughout the period indicated and consistent with the prior financial practices of the Person referred to.

"<u>General Intangible</u>" means (i) all "general intangibles" as defined in the UCC, and (ii) all of Client's present and future general intangibles and all other presently owned or hereafter acquired intangible personal property of Client (including payment intangibles and any and all choses or things in action, goodwill, patents and patent applications, tradenames, servicemarks, trademarks and trademark applications, copyrights, blueprints, drawings, purchase orders, customer lists, monies due or recoverable from pension funds, licenses and rights under any licensing agreements, route lists, infringement claims, software, computer programs, computer discs, computer tapes, literature, reports, catalogs, deposit accounts, tax refunds and tax refund claims) other than Goods, Accounts, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Equipment, Instruments, Investment Property, Letters of Credit or Letters of Credit Rights, but specifically including all of Client's books and records.

"<u>Goods</u>" means (i) all "goods" as defined in the UCC, and (ii) all of Client's present and hereafter acquired goods, wherever located, including imbedded software to the extent included in "goods", manufactured homes, and standing timber that is cut and removed for sale.

"<u>Instrument</u>" means (i) all "instruments" as defined in the UCC, and (ii) all negotiable instruments or any other writings that evidence a right to the payment of a monetary obligation, is not itself a security agreement or lease, and is of a type that in ordinary course of business is transferred by delivery with any necessary endorsement or assignment. The term does not include (i) Investment Property, (ii) Letters of Credit, or (iii) writings that evidence a right to payment arising out of the use of a credit or charge card or information contained on or for us with the card.

"<u>Inventory</u>" means (i) all "inventory" as defined in the UCC, and (ii) all of Client's inventory, together with all of Client's present and future inventory, including goods held for sale or lease or to be furnished under a contract of service and all of Client's present and future raw materials, work in process, finished goods, shelving and racking upon which the inventory is stored and packing and shipping materials, wherever located, and any documents of title representing any of the above.

"<u>Investment Property</u>" means (i) any "investment property" as defined in the UCC, and (ii) a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract, or commodity account.

"<u>Ledger Debt</u>" means any debt, liability or obligation now or hereafter owing by Client to others, including any present or future client of Factor, which Factor may have obtained or may obtain by purchase, assignment, negotiation, discount, participation or otherwise.

"<u>Letter of Credit</u>" means a commercial or stand-by letter of credit issued by or on behalf of or for the benefit of Client.

"<u>Letter of Credit Right</u>" means (i) "letter of credit right" as defined in the UCC, and (ii) a right to payment or performance under a Letter of Credit, whether or not the beneficiary has demanded or is at the time entitled to demand payment or performance. The term does not include the right of a beneficiary to demand payment or performance under a Letter of Credit.

"<u>Misdirected Payment Fee</u>" means fifteen percent (15%) of the amount of any payment on account of an Account which has been received by Client and not delivered in kind to Factor within two (2) business days following the date of receipt by Client.

"Negotiable Collateral" means all of Client's present and future letters of credit, advises of credit, notes, drafts, instruments, and documents, including, without limitation, bills of lading, leases, and chattel paper, and Client's books and records relating to any of the foregoing.

"Net Invoice Amount" means the invoice amount of the Account, less returns (whenever made), all selling discounts (at Factor's option, calculated on shortest terms), credits or deductions of any kind allowed or granted to or taken by the Customer at any time.

"Obligations" means all present and future obligations owing by Client to Factor, including interest thereon, whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether presently contemplated or not, regardless of how the same arise, or by what instrument, agreement, or book account they may be evidenced, or whether evidenced by any instrument, agreement or book account, whether arising before, during or after the commencement of any federal Bankruptcy Case in which Client is a debtor, including but not limited to Advances, Ledger Debt, fees and expenses, obligations arising pursuant to guaranties, Letters of Credit or acceptance transactions or any other financial accommodations or agreements between Client and Factor.

"Obligor" means Client and any other Person primarily or secondarily, directly or indirectly, liable on any of the Obligations, including, but not limited to, any guarantor thereof (individually an "Obligor" and collectively, the "Obligors"),

"Original Term" means the term of this Agreement as reflected in section 15 hereof and "Term" means the Original Term and any extensions thereof.

"Person" means an individual, corporation, limited liability company, partnership, association, trust or unincorporated organization or a government or any agency or political subdivision thereof.

"Prime Rate" means at any time, the rate of interest noted in The Wall Street Journal, Money Rates section, as the "Prime Rate" (currently defined as the base rate on corporate loans posted by at least 75% of the nation's thirty (30) largest banks). In the event that The Wall Street Journal quotes more than one rate, or a range of rates, as the Prime Rate, then the Prime Rate shall mean the average of the quoted rates. In the event that The Wall Street Journal ceases to publish a Prime Rate, then the Prime Rate shall be the average of the three (3) largest U.S. money center commercial banks, as determined by Factor. The "Prime Rate" may not be the lowest or best rate at which Factor calculates interest or extends credit.

"Purchase Price" means the Net Invoice Amount less Factor's Commission.

"Reserve" means a bookkeeping account on the books of the Factor representing an unpaid portion of the Purchase Price and such other amounts as Factor deems advisable as security for the payment and performance by Client of its Obligation hereunder.

"Schedule of Accounts" means a form supplied by Factor from time to time wherein Client lists all Accounts.

"Security Interest" means the rights, title and interest in and to and liens of Factor on and in the Collateral.

"Supporting Obligation" means (i) a "supporting obligation" as defined in the UCC, and (ii) a Letter of Credit Right or secondary obligation that supports the payment or performance of an Account, Chattel paper, a Document, a General Intangible, an Instrument, or Investment Property.

"Termination Fee" means the fee payable to Factor pursuant to Section 10 hereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York.

## <u>SCHEDULE 6.1(c)</u>

Habib American Bank, 99 Madison Avenue, New York, New York, has a lien on all of Client's assets.

Habib American Bank's security interest will be governed by an Intercreditor Agreement between _____ and _____ dated _____ \_\_\_\_, 2005.

## RIDER NUMBER ONE TO

## FACTORING
## AND SECURITY AGREEMENT

THIS RIDER NUMBER ONE TO THE FACTORING AND SECURITY AGREEMENT (this "Rider"), dated as of Nov 2, 2005, is entered into between FCC, LLC ("FCC"), and ANI INDUSTRIES, L.L.C., a New Jersey limited liability company ("Client"); this Rider is hereby made a part of and incorporated into that certain Factoring and Security Agreement (the "Agreement"), of even date herewith between FCC and Client. All obligations incurred by Client pursuant to the Original Rider shall continue in full force and effect, subject to the terms hereof and not the Original Rider, effective as of the date hereof.

1. <u>Definitions</u>. All capitalized terms contained in this Rider shall have the same definition as set forth in the Agreement unless they are specifically defined in this Rider. In addition to the definitions contained in the first paragraph of this Rider, the following terms are specifically defined for use herein:

"Eligible Inventory" means, as at any date of determination, the value (determined at the lower of cost or market on a first-in, first-out basis) of all Inventory consisting of raw materials and finished goods owned by and in the possession of Client and located in the United States of America except the following: (a) finished goods which do not meet the specifications of the purchase order for such goods; (b) Inventory which FCC determines in the exercise of its sole and reasonable discretion to be unacceptable for borrowing purposes due to age, quality, type, category and/or quantity including, without limitation, any Inventory which is obsolete, damaged, not in good condition, or not either currently usable or currently salable in the ordinary course of the business of Client as determined by FCC; (c) Inventory with respect to which FCC does not have a valid, first priority and fully perfected security interest; (d) Inventory with respect to which there exists any security interest, lien or encumbrance in favor of any third party other than FCC; (e) Inventory produced in violation of the Fair Labor Standards Act and subject to the so-called "hot goods" provisions contained in Title 29 U.S.C. 215 (a)(i); (f) Inventory located at any location other than the locations listed on <u>Exhibit 1.3</u>; (i) Inventory consisting of packaging, shipping materials or supplies; (j) Inventory to the extent same is in transit; and (k) finished goods aged over 180 days and raw materials aged over 180 days. In the event that Inventory ceases to be Eligible Inventory, Client shall notify FCC thereof immediately.

"Equipment" means Equipment as defined in the Agreement, including without limitation, all of Client's machinery, apparatus, equipment, motor vehicles, tractors, trailers, rolling stock, fittings, fixtures and other tangible personal property of every kind and description, together with all parts, accessories and special tools and all increases and accessions thereto and substitutions and replacements therefor.

1

"Event of Default" means any of the events described in Section 8 of the Agreement or any breach of any covenant, representation or warranty under the terms of this Rider shall occur.

"Factoring Documents" means the Agreement, this Rider, the Letter of Credit Agreement and all other present or future agreements entered into between Client and FCC in connection with the Agreement.

"Guaranty" means those certain Guarantee's, dated of even date herewith, executed by Naresh Mahtani, Navin Mashtani and Ritesh Mahtani.

"Inventory" means Inventory as defined in the Agreement, including, without limitation, all of Client's present and future inventory (as defined in the UCC), including goods held for sale or lease or to be furnished under a contract of service and all of Client's present and future raw materials, work in process, finished goods, shelving and racking upon which the inventory is stored and packing and shipping materials, wherever located, and any documents of title representing any of the above.

"Inventory Facility" means advances available to Client pursuant to Section 2.1 of this Rider.

2. Advances; Inventory Facility

2.1 Advances. At the request of Client, made at any time and from time to time during the term of the Agreement, and so long as no Event of Default has occurred, FCC, may, in its sole discretion, loan to Client up to thirty percent (30%) of the value of Client's Eligible Inventory provided, however, that in no event shall FCC be obligated to make advances to Client under this Section 2.1 whenever the aggregate amount of advances made pursuant to this Section 2.1 exceeds, at any one time, the amount of the then effective Inventory Facility sublimit that FCC has established for Client. FCC shall advise Client of the amount of the sublimit on the Inventory Facility as FCC shall determine, and may adjust, from time to time. All amounts outstanding under the Inventory Facility shall constitute Obligations and shall be secured by the Collateral.

2.2 Borrowing Base Certificate. Concurrent with the execution of this Rider by Client and concurrent with each request for an advance pursuant to **Section 2.1**, but no less frequently than weekly, Client shall deliver to FCC a fully completed Borrowing Base Certificate certified by the Chief Executive Officer or Chief Financial Officer of Client as being true and correct. Concurrent with the delivery of each such Borrowing Base Certificate, Client shall provide a written report to FCC of all material returns, disputes and claims, together with sales and other reports relating to the Receivables and Inventory as required by FCC.

3. Interest on Advances. Advances made by FCC to Client pursuant to this Rider shall bear interest at a per annum rate of interest of the greater of one percent (1%) above the Prime Rate or seven percent (7%) per annum. Adjustment to the Prime Rate, payment of interest and all other aspects of this Inventory Facility which are not specifically provided for in this Rider shall be governed by the terms of the Agreement.

2

4. Repayment.  In the event of any breach by Client of any provision hereof or of the Agreement or upon termination of this Rider or the Agreement, Client will repay upon demand all of the Obligations.  If at any time for any reason, the aggregate outstanding principal amount of all Obligations including advances under this Rider and under the Agreement exceeds the Credit Limit or the advances under this Rider exceeds the limit set forth in Section 2.1 or any other limitation on the amount available to be borrowed hereunder, Client will immediately, without notice or demand, repay the outstanding principal amount of the Obligations, together with accrued and unpaid interest on the amount repaid, in an amount equal to such excess.  Client shall make each payment required hereunder or under the Agreement, without setoff, deduction or counterclaim.

5. Conditions Precedent.  The obligation of FCC to consider requests from Client for advances under the Agreement and this Rider are subject to the fulfillment, to the satisfaction of FCC, of each condition precedent set forth below:

5.1 Execution and delivery to FCC of all of the Agreement, corporate factoring and borrowing resolutions, and the Guaranty, each in form and substance satisfactory to FCC in its sole discretion;

5.2 Delivery to FCC of evidence that FCC is named as an additional insured under all of Client's insurance policies and a loss payee endorsement and certificate of additional insured acceptable to Lender; and

5.3 Delivery to FCC of a waiver by any landlord or mortgage holder or any other party that may have statutory rights to the Inventory or other Collateral, in form and substance satisfactory to FCC.

6. Inventory Records.  Client shall keep correct and accurate records itemizing and describing the kind, type, quality and quantity of the Inventory, and its cost therefor, all of which records shall be available upon demand to any of FCC's officers, agents and employees for inspection and copying.

7. Insurance.  Client, at its expense, shall keep and maintain its Inventory and Equipment insured against loss or damage by fire, theft, explosion, sprinklers and all other hazards and risks ordinarily insured against by businesses selling similar inventory or operating similar equipment, for the full insurable value thereof.  Client shall deliver to FCC certified copies of such policies of insurance and evidence of the payments of all premiums therefor.  All such policies of insurance shall be in such form, with such companies, and in such amounts as may be satisfactory to FCC.  All such policies of insurance shall contain an endorsement in a form satisfactory to FCC showing FCC as a loss payee thereof, with a waiver of warranties on a 438-BFU endorsement, and all proceeds payable thereunder shall be payable to FCC and, upon receipt by FCC, shall be applied on account of the Obligations owing to FCC.  Client shall immediately notify FCC of any cancellation or termination of any insurance policy.  To secure the payment of the Obligations, Client grants FCC a security interest in and to all such policies of

3

insurance and the proceeds thereof, and Client shall direct all insurers under such policies of insurance to pay all proceeds thereof directly to FCC.

        8.  <u>Inventory Report</u>.  Client shall deliver to FCC within ten (10) days after the end of each month a report certified by the Chief Executive Officer or Chief Financial Officer of Client as being true and correct, setting forth as of the end of each month, (i) a current detailed aging, by total and by customer, of Client's Receivables, (ii) a current detailed aging, by total and by vendor, of Client's accounts payable, and (iii) a detailed report of Client's Inventory, setting forth the quantity, type and cost thereof, all of which shall be set forth in a form and shall contain such information as is acceptable to FCC.  Client will also conduct a physical inventory count no less frequently than annually, adjust Client's records to reflect the results of the count and deliver to FCC monthly a list of locations of Inventory and the types and values of Inventory at each such location, in such form as FCC may require.  At FCC's request, Client shall conduct such physical inventory counts and deliver such information more or less often than described above and such other information with respect to the Collateral, Client or Client's business as FCC may reasonably request.

        9.  <u>Client's Representations and Warranties</u>.  Client makes the following representations and warranties which shall be deemed to be continuing representations and warranties so long as this Rider remains in effect and until the Obligations have been repaid in full:

        9.1 Inventory.

        (a) The Inventory is currently located only at the locations identified on <u>Exhibit 1.3</u>;

        (b) All Inventory is now and at all times hereafter shall be of good and merchantable quality, free from defects;

        (c) The Inventory is and shall remain free from all liens, claims, encumbrances, and security interests (except as held by FCC, and except as may be specifically consented, in advance and in writing, by FCC);

        (d) The Inventory is not now stored with a bailee, warehouseman or similar party; and

        (e) Client currently keeps correct and accurate records itemizing and describing the kind, type, quality and quantity of the Inventory, and its cost therefor.

        9.2 <u>Equipment</u>.

        (a) All of the Equipment is used or held for use in Client's business and is fit for such purposes;

(b) The Equipment is and shall remain free from all liens, claims, encumbrances, and security interests (except as held by FCC, and except as may be specifically consented, in advance and in writing, by FCC);;

(c) The Equipment is not stored with a bailee, warehouseman, or similar party (without Client's prior written consent) and are located only at the locations identified on Exhibit 9.2.

10. No Conflict. The execution, delivery and performance by Client of this Rider: (a) shall not constitute an event of default under any agreement, indenture or undertakings to which Client is a party or by which it or any of its property may be bound or affected; (b) are not in contravention of or in conflict with any law or regulation; and (c) do not cause any lien, charge or other encumbrance to be created or imposed upon any such property by reason thereof.

11. Additional Covenants.

11.1   Loans to Officers. During the term of the Agreement, all loans by Client to officers of Client shall be subordinated to the Obligations pursuant to subordination agreements in form and substance satisfactory to FCC in its sole discretion.

12. Event of Default. If an Event of Default occurs and is continuing:

(i)   FCC may, without demand or notice to Client, terminate FCC's commitment, if any, to make loans or to extend other financial accommodations to Client under this Rider or the Agreement, and may declare the entire principal amount of all loans and advances outstanding, all interest thereon, any unpaid fees and all other Obligations of any kind or nature to be, and thereupon the same will immediately become, due and payable in full.

(ii)   FCC may decrease the advance rates set forth herein or in the Agreement in FCC's discretion.

(iii)   FCC may exercise all of the rights granted to it under the Agreement.

(iv)   Without notice to or demand upon Client or any other person, FCC may make such payments and do such acts as FCC considers necessary or reasonable to protect its security interest in the Collateral. Client authorizes FCC to enter the premises where the Collateral is located, take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest or compromise any Lien which in FCC's opinion appears to be prior or superior to its security interest in all or any of the Collateral and to pay all expenses incurred in connection therewith.

(v)   FCC may ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale and sell the Collateral. Any such sale may be either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms. It is not necessary that the Collateral be present at any such sale.

(vi)    FCC may, without notice to Client except as expressly provided herein, at FCC's option, exercise any of the remedies available to FCC as a secured party under the UCC as in effect in any applicable jurisdiction, or otherwise available to FCC under applicable law. Client agrees, upon an Event of Default, to cease the sale or other disposition of the Collateral, except with FCC's prior written consent, and to assemble at Client's expense all the Collateral at a convenient place acceptable to FCC. FCC may charge to Client's account and Client will pay FCC upon demand all costs and expenses, including attorneys' fees (including fees of attorneys that are regular salaried employees of FCC or any of its Affiliates), incurred: (A) upon the liquidation of any Collateral; (B) to obtain or enforce payment of the Obligations; (C) in the settlement, adjustment, compromise, or litigation of Customer disputes; or (D) in the prosecution or defense of any action or proceeding either against FCC or against Client concerning any matter growing out of or in connection with the Agreement, this Rider and/or any Collateral and/or any Obligations. If at any time FCC pays any state, city, local, federal, or other tax or levy attributable to the Collateral, Client will repay to FCC the amount of tax so paid by FCC. Client agrees that FCC may apply any proceeds from disposition of the Collateral first to satisfy obligations secured by liens prior to FCC's security interest. Client will remain liable and will pay on demand any deficiencies arising upon the liquidation of any security held by FCC.

(a)    License. Client hereby grants to FCC a license or other right to use, without charge, Client's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral and Client's rights under all licenses, and all franchise agreements shall inure to FCC's benefit.

(b)    Remedies Cumulative. FCC's rights and remedies under the Agreement, this Rider and all other documents or agreements between the parties hereto shall be cumulative. FCC shall have all other rights and remedies not inconsistent herewith as provided under the UCC, by law, or in equity. No exercise by FCC of one right or remedy shall be deemed an election, and no waiver by FCC of any default on Client's part shall be deemed a continuing waiver. No delay by FCC shall constitute a waiver, election or acquiescence by it.

13.    Incorporation into Agreement. This Rider and all of the terms, covenants, warranties, conditions, agreements and representations contained herein are incorporated into and deemed part of the Agreement.

14    Binding Agreement. This Rider is the valid, binding and legally enforceable obligation of Client in accordance with its terms.

15.    This Rider is deemed made in the State of New York and shall be governed, interpreted, and construed in accordance with the laws of the State of New York. No modification, amendment, waiver, or discharge of this Agreement shall be binding upon FCC unless in writing and signed by FCC. TRIAL BY JURY IS HEREBY WAIVED by Factor and Client in any action, proceeding or counterclaim brought by

6

Client or FCC against the other on any matters whatsoever arising out of or in any way connected with this Rider or the Agreement, or the relations created hereby, whether for contract, tort, or otherwise, and Client hereby consents to the jurisdiction of the courts of the State of New York located in New York County, New York and of any Federal Court located in New York County, New York in such state for determination of any dispute as to any such matters.  In connection therewith, Client hereby waives personal service of any summons, complaint, or other process, and agrees that service thereof may be made by registered or certified mail directed to Client at the address set forth in the Agreement.

IN WITNESS WHEREOF, the parties have executed this Rider as of the date first hereinabove written.

ANI INDUSTRIES, L.L.C.,
a New Jersey limited liability company

By: _____
    Naresh Mahtani, Member/Manager


FCC, LLC

By: _____
    Ric Mazza, Executive Vice President

7

Exhibit 1.3


1407 Broadway, Suite 931

New York, New York   10018


501 Pen-Horn Avenue, Unit #8

Secaucus, New Jersey   07094

Exhibit 8

Form of Inventory Report



1177 Avenue of the Americas

New York N.Y. 10036

Phone:  (212) 920-2803

Fax:  (212) 920-2820

CLIENT NAME: _____

ADDRESS:        _____

| INVENTORY CERTIFICATION | INVENTORY |
|---|---|
| **As of** _____ | |
| FINISHED GOODS HELD FOR SALE: | $ |
| FINISHED GOODS – STOCK: | |
| OTHER _____: | |
| OTHER _____: | |
| MISCELLANEOUS: | |
| SUB TOTAL COLLATERAL | $ |
| LESS INELIGIBLES: | |
| TOTAL ELIGIBLE INVENTORY COLLATERAL | $ |

Borrower hereby (a) as security for the repayment of Borrower's present and future indebtedness to FCC, LLC d/b/a First Capital (herein referred to as "FCC"), assigns, transfers and pledges to FCC and its successors, and assigns, and gives and agrees that FCC has a security interest in, under and pursuant to the Factoring Agreement and the Security Agreement Supplement-Inventory or other financing instruments between Borrower and FCC, the Inventory (i.e. Merchandise) generally identified herein or described in lien statements or security agreements attached hereto, and in all presently outstanding Inventory now owned by Borrower, and all Inventory hereafter created, acquired or purchased by Borrower; (b) warrants and certifies to FCC that all Inventory made or acquired since the prior Certification is identified herein or is evidenced by supplier's invoices, purchase journals, production reports, or other records attached hereto, and that all Inventory of Borrower is as shown as of the date shown hereon and that Borrower now has in its possession and control, or in the possession of a

9

third party of its account which third party has identified in writing by Borrower to FCC, Inventory in that amount (c) warrants that the total of withdrawals since the prior Certification are as shown; and (d) warrants and represents that Inventory valuations are taken from Borrower's Inventory records, kept in accordance with generally accepted accounting principles and used in Borrower's business and/or taken from a physical inventory, and that such valuations are at the lower of cost or market, with appropriate allowances for slow moving, returned or second quality goods. This certification of Inventories is expressly made a part of and subject to the terms and conditions of the Factoring Agreement and the Security Agreement Supplement-Inventory.

Borrower hereby certifies that all Inventories are located at the following addresses:

_____    _____    _____

_____    _____    _____

_____    _____    _____

_____
Authorized Signature

_____
Print Name/Title

E:FL-Factoring/Contracts/Inventory Certification.doc

Exhibit 9.2

1407 Broadway, Suite 931

New York, New York   10018

501 Pen-Horn Avenue, Unit #8

Secaucus, New Jersey   07094

Exhibit B

# GUARANTY OF INDIVIDUAL

FOR VALUE RECEIVED and in consideration of any loan or advance now or hereafter made to **ANI INDUSTRIES, L.L.C.** (together with its successors and assigns, "Borrower") by **FCC, LLC** ("Lender"), which loans and advances will be to the direct interest and advantage of the undersigned, and to induce Lender from time to time to make loans to Borrower, the undersigned and Lender agree as follows:

## 1.    CHARACTER OF OBLIGATION.

The undersigned hereby unconditionally guarantees the full payment and performance by Borrower of any such loans, whether or not evidenced by promissory notes, any obligations for letters of credit or agreements with respect thereto, any drafts or any obligations for acceptances or agreements with respect thereto, including all interest and other charges stated therein, any other loans, promissory notes, advances or overadvances, including all interest and other charges stated therein, all obligations of Borrower under any security agreement, instrument of lien, security deed or other security device in favor of Lender, and all other obligations of Borrower to Lender however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter the "Obligations"). The obligation of the undersigned hereunder is primary and unconditional and shall be enforceable before, concurrently or after any claim or demand is made or suit is filed against Borrower or any other guarantor or surety, and before, concurrently or after any proceeding by Lender against any security, and shall be effective regardless of the solvency or insolvency of Borrower at any time, the extension or modification of the Obligations by operation of law, agreement, or otherwise, or the subsequent reorganization, merger or consolidation of Borrower, or any other change in its composition, nature, personnel or location. The obligation hereunder may be considered by Lender either as a guaranty or agreement of surety. Payment of any sum or sums due to Lender hereunder will be made by the undersigned immediately upon demand by Lender. If claim is ever made upon Lender for repayment or recovery of any amount or amounts received by Lender in payment of any of the Obligations and Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its property, or (b) any settlement or compromise of any such claim effected by Lender with any such claimant (including Borrower), then in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of the Obligations, and the undersigned shall be and remain obligated to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The undersigned agrees that the books and records of Lender showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing

the items therein set forth, and shall constitute prima facie proof thereof, except that the monthly statements rendered to Borrower by Lender shall, to the extent to which no objection is made within thirty (30) days after date thereof, constitute an account stated between Lender and Borrower binding upon the undersigned. The undersigned agrees to pay all costs of Lender of collection of any sum or sums due hereunder, and, if collected by or through an attorney, reasonable attorneys' fees together with all other legal and court expenses. The undersigned hereby transfers and conveys to Lender any and all of his balances, credits, deposits, accounts, items and monies now or hereafter in possession or control of, or otherwise with Lender or any affiliate of Lender, and Lender is hereby given a security interest upon and in all property of the undersigned of every kind and description now or hereafter in the possession or control of Lender or any affiliate of Lender for any reason, including all dividends and distributions or other rights in connection therewith. The undersigned agrees that his obligation hereunder shall not be discharged or impaired in any respect by reason of any failure by Lender to perfect, or continue perfection of, any lien or security interest in any security or any delay by Lender in perfecting any such lien or security interest.

2.    **CONSENT AND WAIVER**.

The undersigned waives notice of acceptance hereof, creation of any of the Obligations, or nonpayment or default by Borrower under any of the Obligations or any agreement now or hereafter existing between Borrower and Lender, presentment, demand, notice of dishonor, protest and any other notices whatever. The undersigned waives any rights provided under applicable law to require Lender to pursue any collateral that Lender has for the Obligations, the Borrower, any other guarantor or any other party and waives any rights to require the Lender to marshal assets. The undersigned waives any right to direct the application of payments provided for under applicable law and agrees that Lender may apply any payments received from the undersigned, Borrower or any other person or entity to the Obligations in such order as Lender may elect in its discretion and that Lender may reverse and reapply such payments as it deems appropriate. The undersigned, without affecting his liability hereunder, consents to and waives notice of all changes of terms of the Obligations, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the Obligations, renewal, indulgence, settlement, compromise or failure to exercise due diligence in collection, the acceptance or release of security, extension of the time to pay for any period or periods whether or not longer than the original period, or any surrender, substitution or release of any other person directly or indirectly liable for any of the Obligations or any collateral security given by Borrower. The undersigned agrees that he shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of Borrower or to any collateral for the Obligations, even upon payment in full of the Obligations. The undersigned also consents to and waives notice of any arrangements or settlements made in or out of court in the event of receivership, liquidation, readjustment, any proceeding under Title 11 of the United States Code (entitled "Bankruptcy") as amended, or assignment for the benefit of creditors of Borrower, and anything whatever whether or not herein specified which may be done or waived by or between Lender and Borrower, or Borrower and any other person whose claim against Borrower has been

or shall be assigned or transferred to Lender. The undersigned agrees that if any notification of intended disposition of collateral or of any other act by Lender is required by law to be given to the undersigned and a specific time period is not stated therein, such notification, if mailed by first class mail at least ten (10) days before such disposition or act, postage prepaid, addressed to the undersigned either at the address shown below or at any other address of the undersigned appearing on the records of Lender, shall be deemed reasonably and properly given. Lender may, without notice of any kind, sell, assign or transfer any or all of the Obligations and in such event each and every immediate and successive assignee, transferee or holder of any of the Obligations shall have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee, transferee or holder, as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits; provided, however, that Lender shall have an unimpaired right prior and superior to that of any such assignee, transferee or holder to enforce this Guaranty for the benefit of Lender as to such of the Obligations as were not sold, assigned or transferred. The undersigned hereby consents to the request and review by Lender of the personal credit reports of the undersigned. THE UNDERSIGNED HEREBY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED HEREON. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY RELATED DOCUMENT MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YRK AND EACH OF THE UNDERSIGNED AND LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH OF THE UNDERSIGNED AND LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS GUARANTY OR ANY DOCUMENT RELATED HERETO.

3.    **CONSTRUCTION**.

This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New York as an agreement made and to be entirely performed within the State of New York. Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. This Guaranty does not supersede any other guaranty or other agreement executed by the undersigned, or any other guaranty in favor of Lender.

4.    **BENEFIT**.

This Guaranty shall bind the undersigned, his heirs, personal representatives and assigns, and the rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Lender's successors and assigns to Borrower.

5.    **DURATION**.

This Guaranty shall continue in full force and effect until terminated by the actual receipt by Lender by registered or certified mail of written notice of termination from the undersigned or from the legal representative of the undersigned if the undersigned is deceased. Such termination shall not be effective with respect to, and this Guaranty shall remain in full force and effect as to, (a) all Obligations existing at the date of receipt of such notice, including all renewals, compromises, modifications, extensions, and other amendments relating thereto, all interest thereon and collection expenses therefor, until full payment of such Obligations to Lender, (b) Obligations arising after receipt of notice of termination which are connected to Obligations theretofore arising or to transactions theretofore entered into, and (c) any other obligation of the undersigned under this Guaranty which expressly survives such termination. The execution and delivery hereafter to Lender by the undersigned of a new instrument of guarantee shall not terminate, supersede, or cancel this instrument unless expressly so provided therein, and all rights and remedies of Lender under this Guaranty or under any instrument of guarantee heretofore or hereafter executed and delivered to Lender by the undersigned shall be cumulative and may be exercised singly or concurrently.

Signed this _11_ day of _2_____, 2005.

_____(L.S.)
Naresh Mahtani

Address:

6 Meadows Lane_____
Closter, New Jersey   07624_____

-4-

STATE OF _New York_

COUNTY OF _New York_

Before me, the undersigned authority, on this date personally appeared Naresh Mahtani, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this _2nd_ day of _November_, 2005.

_____
Notary Public

( S E A L )

ARTHUR STRACHMAN
NOTARY PUBLIC, State of New York
No. 01ST6119865
Qualified in Nassau County
Commission Expires Nov. 22, 2008

My Commission Expires:
_11/22/08_
Commission No. _01ST61189K_

## ACCEPTANCE

The foregoing Guaranty is accepted in New York, New York this _2_ day of _Nov._, 2005.

FCC, LLC

By: _____
Ric Mazza, Executive Vice President

-5-

# GUARANTY OF INDIVIDUAL

FOR VALUE RECEIVED and in consideration of any loan or advance now or hereafter made to **ANI INDUSTRIES, L.L.C.** (together with its successors and assigns, "Borrower") by **FCC, LLC** ("Lender"), which loans and advances will be to the direct interest and advantage of the undersigned, and to induce Lender from time to time to make loans to Borrower, the undersigned and Lender agree as follows:

## 1.    CHARACTER OF OBLIGATION.

The undersigned hereby unconditionally guarantees the full payment and performance by Borrower of any such loans, whether or not evidenced by promissory notes, any obligations for letters of credit or agreements with respect thereto, any drafts or any obligations for acceptances or agreements with respect thereto, including all interest and other charges stated therein, any other loans, promissory notes, advances or overadvances, including all interest and other charges stated therein, all obligations of Borrower under any security agreement, instrument of lien, security deed or other security device in favor of Lender, and all other obligations of Borrower to Lender however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter the "Obligations"). The obligation of the undersigned hereunder is primary and unconditional and shall be enforceable before, concurrently or after any claim or demand is made or suit is filed against Borrower or any other guarantor or surety, and before, concurrently or after any proceeding by Lender against any security, and shall be effective regardless of the solvency or insolvency of Borrower at any time, the extension or modification of the Obligations by operation of law, agreement, or otherwise, or the subsequent reorganization, merger or consolidation of Borrower, or any other change in its composition, nature, personnel or location. The obligation hereunder may be considered by Lender either as a guaranty or agreement of surety. Payment of any sum or sums due to Lender hereunder will be made by the undersigned immediately upon demand by Lender. If claim is ever made upon Lender for repayment or recovery of any amount or amounts received by Lender in payment of any of the Obligations and Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its property, or (b) any settlement or compromise of any such claim effected by Lender with any such claimant (including Borrower), then in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of the Obligations, and the undersigned shall be and remain obligated to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The undersigned agrees that the books and records of Lender showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing

the items therein set forth, and shall constitute prima facie proof thereof, except that the monthly statements rendered to Borrower by Lender shall, to the extent to which no objection is made within thirty (30) days after date thereof, constitute an account stated between Lender and Borrower binding upon the undersigned. The undersigned agrees to pay all costs of Lender of collection of any sum or sums due hereunder, and, if collected by or through an attorney, reasonable attorneys' fees together with all other legal and court expenses. The undersigned hereby transfers and conveys to Lender any and all of his balances, credits, deposits, accounts, items and monies now or hereafter in possession or control of, or otherwise with Lender or any affiliate of Lender, and Lender is hereby given a security interest upon and in all property of the undersigned of every kind and description now or hereafter in the possession or control of Lender or any affiliate of Lender for any reason, including all dividends and distributions or other rights in connection therewith. The undersigned agrees that his obligation hereunder shall not be discharged or impaired in any respect by reason of any failure by Lender to perfect, or continue perfection of, any lien or security interest in any security or any delay by Lender in perfecting any such lien or security interest.

2.    **CONSENT AND WAIVER.**

The undersigned waives notice of acceptance hereof, creation of any of the Obligations, or nonpayment or default by Borrower under any of the Obligations or any agreement now or hereafter existing between Borrower and Lender, presentment, demand, notice of dishonor, protest and any other notices whatever. The undersigned waives any rights provided under applicable law to require Lender to pursue any collateral that Lender has for the Obligations, the Borrower, any other guarantor or any other party and waives any rights to require the Lender to marshal assets. The undersigned waives any right to direct the application of payments provided for under applicable law and agrees that Lender may apply any payments received from the undersigned, Borrower or any other person or entity to the Obligations in such order as Lender may elect in its discretion and that Lender may reverse and reapply such payments as it deems appropriate. The undersigned, without affecting his liability hereunder, consents to and waives notice of all changes of terms of the Obligations, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the Obligations, renewal, indulgence, settlement, compromise or failure to exercise due diligence in collection, the acceptance or release of security, extension of the time to pay for any period or periods whether or not longer than the original period, or any surrender, substitution or release of any other person directly or indirectly liable for any of the Obligations or any collateral security given by Borrower. The undersigned agrees that he shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of Borrower or to any collateral for the Obligations, even upon payment in full of the Obligations. The undersigned also consents to and waives notice of any arrangements or settlements made in or out of court in the event of receivership, liquidation, readjustment, any proceeding under Title 11 of the United States Code (entitled "Bankruptcy") as amended, or assignment for the benefit of creditors of Borrower, and anything whatever whether or not herein specified which may be done or waived by or between Lender and Borrower, or Borrower and any other person whose claim against Borrower has been

or shall be assigned or transferred to Lender.  The undersigned agrees that if any notification of intended disposition of collateral or of any other act by Lender is required by law to be given to the undersigned and a specific time period is not stated therein, such notification, if mailed by first class mail at least ten (10) days before such disposition or act, postage prepaid, addressed to the undersigned either at the address shown below or at any other address of the undersigned appearing on the records of Lender, shall be deemed reasonably and properly given.  Lender may, without notice of any kind, sell, assign or transfer any or all of the Obligations and in such event each and every immediate and successive assignee, transferee or holder of any of the Obligations shall have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee, transferee or holder, as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits; provided, however, that Lender shall have an unimpaired right prior and superior to that of any such assignee, transferee or holder to enforce this Guaranty for the benefit of Lender as to such of the Obligations as were not sold, assigned or transferred.  The undersigned hereby consents to the request and review by Lender of the personal credit reports of the undersigned.  THE UNDERSIGNED HEREBY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED HEREON.   ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY RELATED DOCUMENT MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YRK AND EACH OF THE UNDERSIGNED AND LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS.  EACH OF THE UNDERSIGNED AND LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS GUARANTY OR ANY DOCUMENT RELATED HERETO.

3.    **CONSTRUCTION**.

This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New York as an agreement made and to be entirely performed within the State of New York.  Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.  This Guaranty does not supersede any other guaranty or other agreement executed by the undersigned, or any other guaranty in favor of Lender.

4.    **BENEFIT**.

This Guaranty shall bind the undersigned, his heirs, personal representatives and assigns, and the rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Lender's successors and assigns to Borrower.

5.    **DURATION**.

This Guaranty shall continue in full force and effect until terminated by the actual receipt by Lender by registered or certified mail of written notice of termination from the undersigned or from the legal representative of the undersigned if the undersigned is deceased.  Such termination shall not be effective with respect to, and this Guaranty shall remain in full force and effect as to, (a) all Obligations existing at the date of receipt of such notice, including all renewals, compromises, modifications, extensions, and other amendments relating thereto, all interest thereon and collection expenses therefor, until full payment of such Obligations to Lender, (b) Obligations arising after receipt of notice of termination which are connected to Obligations theretofore arising or to transactions theretofore entered into, and (c) any other obligation of the undersigned under this Guaranty which expressly survives such termination.   The execution and delivery hereafter to Lender by the undersigned of a new instrument of guarantee shall not terminate, supersede, or cancel this instrument unless expressly so provided therein, and all rights and remedies of Lender under this Guaranty or under any instrument of guarantee heretofore or hereafter executed and delivered to Lender by the undersigned shall be cumulative and may be exercised singly or concurrently.

Signed this _2nd_ day of _November_, 2005.

_____(L.S.)
Navin Mahtani

Address:

333 East 56th Street
New York City, New York   10021

-4-

STATE OF  _Ne~Yok_

COUNTY OF  _Ne Yulk_

Before me, the undersigned authority, on this date personally appeared Navin Mahtani, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this _2nd_ day of _November_ , 2005.

**ARTHUR STRACHMAN**
**NOTARY PUBLIC, State of New York**
**No. 01ST6118985**
**Qualified in Nassau County**
**Commission Expires Nov. 22, 2008**

_____
Notary Public

( S E A L )

My Commission Expires:
_11 rrl wo P_
Commission No. _01ST6118985_

## ACCEPTANCE

The foregoing Guaranty is accepted in New York, New York this _2_ day of _Nov._ , 2005.

FCC, LLC

By: _____
Ric Mazza, Executive Vice President

-5-

STATE OF _New York_

COUNTY OF _New York_

Before me, the undersigned authority, on this date personally appeared Naresh Mahtani, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this _2nd_ day of _November_, 2005.

_____
Notary Public

( S E A L )

ARTHUR STRACHMAN
NOTARY PUBLIC, State of New York
No. 01ST6119965
Qualified in Nassau County
Commission Expires Nov. 22, 2008

My Commission Expires:
_11/22/08_
Commission No. _01ST6118965_

## ACCEPTANCE

The foregoing Guaranty is accepted in New York, New York this _2_ day of _Nov._, 2005.

FCC, LLC

By: _____
Ric Mazza, Executive Vice President

-5-

# GUARANTY OF INDIVIDUAL

FOR VALUE RECEIVED and in consideration of any loan or advance now or hereafter made to **ANI INDUSTRIES, L.L.C.** (together with its successors and assigns, "Borrower") by **FCC, LLC** ("Lender"), which loans and advances will be to the direct interest and advantage of the undersigned, and to induce Lender from time to time to make loans to Borrower, the undersigned and Lender agree as follows:

1.    **CHARACTER OF OBLIGATION.**

The undersigned hereby unconditionally guarantees the full payment and performance by Borrower of any such loans, whether or not evidenced by promissory notes, any obligations for letters of credit or agreements with respect thereto, any drafts or any obligations for acceptances or agreements with respect thereto, including all interest and other charges stated therein, any other loans, promissory notes, advances or overadvances, including all interest and other charges stated therein, all obligations of Borrower under any security agreement, instrument of lien, security deed or other security device in favor of Lender, and all other obligations of Borrower to Lender however and whenever incurred or evidenced, whether direct or indirect, absolute or contingent, or due or to become due (hereafter the "Obligations"). The obligation of the undersigned hereunder is primary and unconditional and shall be enforceable before, concurrently or after any claim or demand is made or suit is filed against Borrower or any other guarantor or surety, and before, concurrently or after any proceeding by Lender against any security, and shall be effective regardless of the solvency or insolvency of Borrower at any time, the extension or modification of the Obligations by operation of law, agreement, or otherwise, or the subsequent reorganization, merger or consolidation of Borrower, or any other change in its composition, nature, personnel or location. The obligation hereunder may be considered by Lender either as a guaranty or agreement of surety. Payment of any sum or sums due to Lender hereunder will be made by the undersigned immediately upon demand by Lender. If claim is ever made upon Lender for repayment or recovery of any amount or amounts received by Lender in payment of any of the Obligations and Lender repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of its property, or (b) any settlement or compromise of any such claim effected by Lender with any such claimant (including Borrower), then in such event the undersigned agrees that any such judgment, decree, order, settlement or compromise shall be binding upon the undersigned, notwithstanding any revocation hereof or the cancellation of any note or other instrument evidencing any of the Obligations, and the undersigned shall be and remain obligated to Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by Lender. The undersigned agrees that the books and records of Lender showing the account between Lender and Borrower shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing

Personal Gurany Ritesh NY Counsel comments1.Doc
Guaranty of Individual

the items therein set forth, and shall constitute prima facie proof thereof, except that the monthly statements rendered to Borrower by Lender shall, to the extent to which no objection is made within thirty (30) days after date thereof, constitute an account stated between Lender and Borrower binding upon the undersigned. The undersigned agrees to pay all costs of Lender of collection of any sum or sums due hereunder, and, if collected by or through an attorney, reasonable attorneys' fees together with all other legal and court expenses. The undersigned hereby transfers and conveys to Lender any and all of his balances, credits, deposits, accounts, items and monies now or hereafter in possession or control of, or otherwise with Lender or any affiliate of Lender, and Lender is hereby given a security interest upon and in all property of the undersigned of every kind and description now or hereafter in the possession or control of Lender or any affiliate of Lender for any reason, including all dividends and distributions or other rights in connection therewith. The undersigned agrees that his obligation hereunder shall not be discharged or impaired in any respect by reason of any failure by Lender to perfect, or continue perfection of, any lien or security interest in any security or any delay by Lender in perfecting any such lien or security interest.

2.    **CONSENT AND WAIVER.**

The undersigned waives notice of acceptance hereof, creation of any of the Obligations, or nonpayment or default by Borrower under any of the Obligations or any agreement now or hereafter existing between Borrower and Lender, presentment, demand, notice of dishonor, protest and any other notices whatever. The undersigned waives any rights provided under applicable law to require Lender to pursue any collateral that Lender has for the Obligations, the Borrower, any other guarantor or any other party and waives any rights to require the Lender to marshal assets. The undersigned waives any right to direct the application of payments provided for under applicable law and agrees that Lender may apply any payments received from the undersigned, Borrower or any other person or entity to the Obligations in such order as Lender may elect in its discretion and that Lender may reverse and reapply such payments as it deems appropriate. The undersigned, without affecting his liability hereunder, consents to and waives notice of all changes of terms of the Obligations, the withdrawal or extension of credit or time to pay, the release of the whole or any part of the Obligations, renewal, indulgence, settlement, compromise or failure to exercise due diligence in collection, the acceptance or release of security, extension of the time to pay for any period or periods whether or not longer than the original period, or any surrender, substitution or release of any other person directly or indirectly liable for any of the Obligations or any collateral security given by Borrower. The undersigned agrees that he shall have no right of subrogation, reimbursement or indemnity whatsoever and no right of recourse to or with respect to any assets or property of Borrower or to any collateral for the Obligations, even upon payment in full of the Obligations. The undersigned also consents to and waives notice of any arrangements or settlements made in or out of court in the event of receivership, liquidation, readjustment, any proceeding under Title 11 of the United States Code (entitled "Bankruptcy") as amended, or assignment for the benefit of creditors of Borrower, and anything whatever whether or not herein specified which may be done or waived by or between Lender and Borrower, or Borrower and any other person whose claim against Borrower has been

or shall be assigned or transferred to Lender. The undersigned agrees that if any notification of intended disposition of collateral or of any other act by Lender is required by law to be given to the undersigned and a specific time period is not stated therein, such notification, if mailed by first class mail at least ten (10) days before such disposition or act, postage prepaid, addressed to the undersigned either at the address shown below or at any other address of the undersigned appearing on the records of Lender, shall be deemed reasonably and properly given. Lender may, without notice of any kind, sell, assign or transfer any or all of the Obligations and in such event each and every immediate and successive assignee, transferee or holder of any of the Obligations shall have the right to enforce this Guaranty, by suit or otherwise, for the benefit of such assignee, transferee or holder, as fully as if such assignee, transferee or holder were herein by name specifically given such rights, powers and benefits; provided, however, that Lender shall have an unimpaired right prior and superior to that of any such assignee, transferee or holder to enforce this Guaranty for the benefit of Lender as to such of the Obligations as were not sold, assigned or transferred. The undersigned hereby consents to the request and review by Lender of the personal credit reports of the undersigned. THE UNDERSIGNED HEREBY WAIVES ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED HEREON. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS GUARANTY OR ANY RELATED DOCUMENT MAY BE BROUGHT IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YRK AND EACH OF THE UNDERSIGNED AND LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. EACH OF THE UNDERSIGNED AND LENDER IRREVOCABLY WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF THIS GUARANTY OR ANY DOCUMENT RELATED HERETO.

3.    **CONSTRUCTION**.

This Guaranty shall be governed by and construed and enforced in accordance with the laws of the State of New York as an agreement made and to be entirely performed within the State of New York. Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under applicable law, said provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. This Guaranty does not supersede any other guaranty or other agreement executed by the undersigned, or any other guaranty in favor of Lender.

4.    **BENEFIT**.

This Guaranty shall bind the undersigned, his heirs, personal representatives and assigns, and the rights and privileges of Lender hereunder shall inure to the benefit of its successors and assigns, and this Guaranty shall be effective with respect to loans or advances made by Lender's successors and assigns to Borrower.

5.    **DURATION**.

This Guaranty shall continue in full force and effect until terminated by the actual receipt by Lender by registered or certified mail of written notice of termination from the undersigned or from the legal representative of the undersigned if the undersigned is deceased.  Such termination shall not be effective with respect to, and this Guaranty shall remain in full force and effect as to, (a) all Obligations existing at the date of receipt of such notice, including all renewals, compromises, modifications, extensions, and other amendments relating thereto, all interest thereon and collection expenses therefor, until full payment of such Obligations to Lender, (b) Obligations arising after receipt of notice of termination which are connected to Obligations theretofore arising or to transactions theretofore entered into, and (c) any other obligation of the undersigned under this Guaranty which expressly survives such termination.  The execution and delivery hereafter to Lender by the undersigned of a new instrument of guarantee shall not terminate, supersede, or cancel this instrument unless expressly so provided therein, and all rights and remedies of Lender under this Guaranty or under any instrument of guarantee heretofore or hereafter executed and delivered to Lender by the undersigned shall be cumulative and may be exercised singly or concurrently.

Signed this __2__ day of __Nov__, 2005.

_____(L.S.)
Ritesh Mahtani

Address:

1520 York Avenue
New York City, New York  10028

-4-

STATE OF _New York_

COUNTY OF _New York_

Before me, the undersigned authority, on this date personally appeared Ritesh Mahtani, known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal this ___2nd___ day of ___November___, 2005.

ARTHUR STRACHMAN
NOTARY PUBLIC, State of New York
No. 01ST6118985
Qualified in Nassau County
Commission Expires Nov. 22, 2008

( S E A L )

_____
Notary Public

My Commission Expires:
_____
Commission No. _01ST6118985_

## ACCEPTANCE

The foregoing Guaranty is accepted in New York, New York this ___2___ day of Nov. _____, 2005.

FCC, LLC

By: _____
Ric Mazza, Executive Vice President

-5-